Harris *v.* The State.

7L 538
f110 48

## JOSEPH HARRIS *v.* THE STATE.

CRIMINAL LAW. *Criminal practice. Jury not judges of the law.* The circuit judge charged: "The jury are judges of the law. Should you conclude that the court has not given you the law correctly, and should you conclude you know the law is otherwise than as given you by the court, then you may pass upon the law as *you* may know it." *Held:*

1. This was error.  In criminal cases juries are judges of the law only under the direction of the court; they have no right to disregard it as given to them; they can only determine the application of the law, as stated by the judge, to the facts as shown in the evidence.

2. The words in sec. 19 of the Bill of Rights—"In all indictments for libel the jury shall have a right to determine the law and the facts, under the direction of the court, as in other criminal cases"—was intended to be a re-enactment of *Fox's Libel Act.* It merely means, the jury in prosecutions for libel shall have a right to render a *general verdict,* as in other criminal cases.  By the immemorial tradition of the common law, as well as by the universal practice of all courts enforcing it, it is the exclusive function of the judge to determine the law, and the office of the jury to receive it as given and apply it to the facts.

3. A proper charge upon this subject is:  The jury are judges of the facts, and the law as it applies to the facts.  In making up their verdict, they are to consider the law in connection with the facts; but the court is the proper source from which they are to get the law.  In other words, they are judges of the law as well as the facts, *under the direction of the court.*

FROM HAWKINS.

Appeal in error from the Circuit Court of Hawkins county.  NEWTON HACKER, J.

HENDERSON & JOUROLMON and GEO. WASHINGTON for Harris.

ATTORNEY-GENERAL LEA for the State.

FREEMAN, J., delivered the opinion of the court.

The defendant has been indicted in the circuit court of Hawkins county for the murder of Charles W. Brown. He was sentenced to be hanged, and has appealed in error to this court.

We need not give a detailed statement of the facts connected with the killing in this opinion, as the case must turn upon the correctness of the charge of his Honor, and if erroneous in any material point affecting injuriously the prisoner, then a reversal must follow, independent of what might be our conclusions as to the guilt or innocence of the accused. It suffices to say, that the case is made out by circumstantial testimony, no one having seen the act, nor is the defendant shown, by any one who saw him, to have been on the premises on the night of the killing. Another man, named Heck, was killed with Brown, while lying on a bed before the fire in a room in a house known as Marble Hall, about four miles from Rogersville, the county seat.

The main circumstances on which the guilt of the prisoner were sought to be established, are, that Brown had money, known to defendant; that he had stayed at the house for several successive nights before the killing, having been employed as a laborer, and was familiar with the premises, and when arrested was found to have a pocket-book, pretty well identified as Brown's, on his person, with $253 of money in it— an amount fairly corresponding with what Brown is

shown to have had—and in addition, had a knife, and an overcoat which he had worn to his mother's the next morning after the killing and left there in her care, and this overcoat is definitely identified as Brown's by a peculiar patch on the lining. In explanation of the fact of the possession of the pocket-book and coat, the prisoner is shown to have told the sheriff who arrested him, on their way back to Rogersville, that on the night of the killing he had met a stranger, a rough, stout man, in the road some few miles from Marble Hall, who proposed to walk on with him as they were going the same way, and when they came opposite to Marble Hall this stranger said to him to wait while he went in the house to see Charley Brown, the deceased; that he sat on the stone wall, while the stranger went to the door and called Brown, who came to the door and let him in; that he remained in the house some considerable time, and came out, handed him the pocket book, probably the coat, and told him to go on the road to a point designated, and wait for him; that he did so, but the stranger failing to come, he walked on over the mountain towards his mother's, where he arrived next morning between nine and ten o'clock, having stopped about sunrise at an acquaintance's and got breakfast.

It has been argued that the statements made by the defendant should have been excluded, on the ground that they were not freely and voluntarily made; but we do not think it necessary to discuss this question, further than to say, there is nothing shown in this record to affect them on this score.

There is a slight inaccuracy in the charge of his Honor on this branch of the case, where he treats the statements made by the prisoner, which we have given in substance above, as confessions, and applies the rules of law applicable to confessions strictly as such, to them.    These statements are not confessions; on the contrary, have more the aspect of denial than confession of guilt.    They are simply the explanation given by the prisoner himself of implicatory facts appearing to connect him with the murder, or as having been connected with some other party in the perpetration of the act,—whether in a manner necessarily involving a participation in the crime, was for the jury to judge from all the facts and circumstances shown in the trial.

His Honor gave the rules of law correctly as to the weight to be attached to confessions as such, with all the qualifications laid down in our law, both favorable and unfavorable to a prisoner.

After telling the jury of the innate weakness of testimony purporting to detail what a party should have said, arising from liability to mistake in understanding, or failure in remembering all that was said, he then said to them, in substance, that, notwithstanding all this, when such confessions were proven clearly, and made free from the influence of hope or fear, they are generally received as among the most effectual proofs in the law.

This is all well.    He then proceeds to tell them that the confessions of a prisoner must all be taken together; but if his statements are irreconcilable, or

if a part of the confessions be disproved, or if, from all the facts and circumstances taken in connection with the confession, the jury believe a part of the statement but not all, they may reject such part as they are satisfied is not true and act on the other part, without rejecting the whole confession.

We but say here, that while there is in this (as we have said) a failure accurately to discriminate between a confession and a statement made attempting to explain implicatory facts appearing against him, it is not seen that there is any material error affecting the prisoner in the principles stated, and the proper mode of dealing with them by the jury, as applicable to the actual facts of the case. The State had proven the implicatory facts against him, and it was but fair, though not required of the State perhaps, that any explanation given by the prisoner serving to mitigate their weight, break their force, or even exculpate him entirely, should be heard for what it was worth. The prisoner, however, could not ask that such explanation when proven should be taken as true, but only that it should be fairly weighed in connection with the other testimony in the case, and its legitimate effect be had, as the jury might deem it entitled to. This was substantially what his Honor's charge amounted to, and of this there can be no complaint. We refer to it, however, at present to show that the effect of this explanation was a fact, and one of some importance, left to the consideration of the jury by his Honor, and one that fairly entered into the case as an element affecting the conclusion to be reached as

to the guilty participation in the crime by the prisoner, and the extent of that participation.

We now proceed to examine what we deem the most vital question in the case. It is the question so distinctly stated by his Honor in his charge as to the right of the jury to judge of the law as well as the facts of the case.

After telling the jury they were the *sole* judges of the credibility of witnesses and of the weight of their evidence, and must determine from the evidence whether the defendant is guilty or not, he then adds: "The jury are also judges of the law. Should you conclude that the court has not given you the law correctly, and should you conclude you know the law is otherwise than as given you by the court, then you may pass upon the law in this case as *you* may know it."

This last, taken in connection with the previous statement—that the jury were the judges of the facts, and were to determine from these the guilt or innocence of the prisoner—can only mean, that the jury, under the qualifications suggested, if such they may be termed, that is, if they conclude the court has not given them the law correctly, or should conclude they know the law is otherwise than as given by the court, then they may pass upon the law, that is, judge as to what the law is, and act on it as they may assume or conclude they know it to be. The word judge, in reference to the facts, is certainly used in the same sense when used in reference to the right of the jury to pass upon the law of the case, and

the only inference to be drawn is that the jury, if they so conclude, may come to what conclusions they deem proper as to the law of the case, disregarding the instructions given them by the court. In plain words, the jury were instructed that it was their legal right, as the court understood it, to come to their own conclusions as to what the law was by which the prisoner's guilt or innocence was to be determined, and if these conclusions were different from the ones reached by the court and given them in charge, it was their right to act on these, and not on the opinion of the court at all.

His Honor—who is shown, by his charges repeatedly before us, to be an excellent and efficient judge—is not intended to be criticised in any spirit of blame for what we must hold to be the errors involved in the above propositions. It must be conceded that the language of several opinions heretofore delivered by able judges of this court seem well to sustain, at any rate to lead to the conclusion that the rule announced was substantially correct. We assume such expressions were inadvertently uttered; but, be that as it may, we cannot assent to their correctness, and proceed to give our reasons for such dissent. This has been done before in an opinion by Judge Turney (Jackson, MS.), and repeatedly approved since; but as the opinion has not been, from some cause, published, it is due to the inferior courts and the profession that the views of this court should be given for their guidance.

We take it, that the theory under discussion is supposed to be sustained and required by sec. 19 of

our Bill of Rights.    That section, after providing that printing presses shall be free to every person to examine the proceedings of the Legislature, or of any branch or officer of the government, then adds: "The free communication of thoughts and opinions is one of the invaluable rights of men, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.    *But* in prosecutions for the publication of papers investigating the official conduct of officers or men in public capacity, the truth thereof may be given in evidence; *and in all* indictments for libel, the jury shall have a right to determine the law and the facts, *under the direction of the court, as in other criminal cases.*"

It is one of the things hard to be accounted for, how the language we have quoted was ever seen to have made any alteration whatever in the recognized, traditionary and long-settled rules of the common law as to the function and rights of a jury in all criminal cases.    We need but recur for a moment to the history of the heated contest that was waged so fiercely in England, in about the last quarter of the last century down to the year 1792, when what is known as Mr. Fox's Libel Bill was passed by the British Parliament, affirming the right of a jury, in all prosecutions for seditious libel, to judge of the law and the facts as in other criminal cases, to see beyond question what principle this clause in our Bill of Rights was intended to settle by embodying it in our organic law.    The contest in England had grown up in this wise: The judges of her law courts—such as Thur-

35—VOL. 7.

low, Kenyon, Butler, and notably Lord Mansfield—
had, in trials of indictments for seditious libels, charged
to have been maliciously published for the purpose of
exciting sedition, and tending to disturb the peace and
good order of society, held that the jury had no right
to return a general verdict of guilty or not guilty,
but could only find the fact of publication, and the
application of the innuendoes to the parties as charged,
and the question of guilt or innocence of the offense,
that is, whether the matter thus published was a ma-
licious and seditious libel or not, was a question of
law solely for the court.   This doctrine, which placed
free speech and the liberty of the press at the mercy
of judges appointed by the crown, was contested by
Lord Camden, the leading spirit of the time in de-
fense of the rights of a free people (at any rate, known
to us), the author of Junius, who joined in the con-
test with perhaps equal ability, and tenfold more viru-
lence, being unknown.   Erskine joined with Camden
in the contest, and in his speech in defense of the
Dean of Asaph, vindicated the right of the jury to
find a verdict as they might deem proper from the
evidence, under the instruction of the court, with an
ability that has never been surpassed, if equaled, at
the English bar.   Lord Camden, in his last great
speech on the subject, laying down and illustrating the
principle for which he had so long contended, said:
" The jury judge of the essential elements of the crime
in cases of murder, not the judge; so," he exclaimed,
" the jury may judge of the intention on which the
crime depends in murder, but not upon an indictment

for libel!"     See Campbell's Lives of Lord Chancel-
lors, vol. 7, p. 44 *et seq.* (Life of Camden), for a re-
view of this contest.     See, also, Erskine's Speech,
Selt. British El., 655.

In view of this history, and the contest that had
been had in England over the question, when the
Constitution of 1834 was framed, when providing for
the freedom of the press and freedom of speech, in
the Bill of Rights was inserted the section quoted,
and the principle of Mr. Fox's Libel Bill was em-
bodied—that "in all indictments for libel, the jury
shall have the right to determine the law and the
facts"—not as they may think the law is, but "under
the direction of the court, as in other criminal cases."
In plain words, should determine the law and the
facts as they did in a trial for murder, or for lar-
ceny, or any other crime.     How was that?     By the
immemorial traditions of the common law, and the
universal custom of the courts administering that law,
the court instructing the jury as to what the law was,
what were the legal elements of the offense, and the
jury finding the party innocent or guilty, as they in
their judgment found these elements in the act of the
party charged; that is, they, under the direction of
the court, said whether he was legally guilty—tried
him by the law of the land, that law given them by
the court for their guide—and then, under our system,
if convicted, the instructions, if erroneous in a matter
affecting the rights of the prisoner, could be reviewed,
and the case reversed and remanded for a new trial,
that the law may be correctly given for the guidance

of the jury, and if convicted at all, be convicted according to law. This is all that was intended, and all the language of the Constitution, fairly interpreted, means. It was not intended, nor does it change the ancient province and rights of a jury in criminal cases, but only to give the jury, or rather to secure to the jury, the right to do in libel cases precisely what they had always done in other criminal cases, to act under the instructions of the court, and judge of the application of the law given to them to the facts proven, and declare the result, either to be innocence or guilt, as the legal elements defined by the court are proven to exist or the contrary.

The opposite theory, as embodied in his Honor's charge, subverts the theory of the Constitution, by authorizing the jury, if they choose, to ·decide the issue submitted to them, not under the direction of the court as to the law, but as *they* may conclude the law to be, which, practically, is to leave them to do as they will, guided by no law at all. The Constitution says they shall exercise their right, under the direction of the court—in no case independent of. it, much less contrary to it.

It has been usually assumed that the right claimed for a jury, as given by his Honor, is one working greatly to his advantage. This may be true in many cases, under the influence of skillful advocacy, appealing to prejudices or sympathies favorable to him, yet certainly does not, in this view, commend itself to the approval of a court, whose sole aim should be the administration and stern enforcement of the law, both

Harris v. The State.

in its penal sanctions, as well as its protective guaranties in favor of the rights of parties accused. But it is easy to see that such a rule may not always work to the advantage of an accused party. The law, it may be, in a case where prejudices and sympathies may be against him, would, if fairly administered, entitle him to acquittal, or only claim a conviction for an inferior grade of offense; yet a jury may conclude they know the law better than the court, or be told they are judges of what it is independent of the direction of the court, and thus onerate the party with the burden of a verdict, which, on appeal in error to this court, rebuts the presumption of innocence, and requires a clear preponderance to the contrary to overturn. In questions of the mere grade of the offense—as between murder in first and second degree, where the line may be difficult to draw from the testimony, especially as imperfectly given in a bill of exceptions—such a verdict will seldom be reversed. Be this as it may, the rule, as an advantage to a guilty party, enabling him to evade the penalty of the law imposed for the protection of society, is on this assumption sustained by an argument that should condemn it as wrong both in principle and policy— one only to be upheld because imperatively demanded by the Constitution or law of the land.

The whole theory, however, presents an anomaly, and contradiction to all the other theories and traditions of our law, impossible to be reconciled or sustained. An error of law, material to the rights of the prisoner, if committed by the court, entitles him

to a new trial, on appeal; yet his opinion is only a subordinate one on the theory, of no absolute binding force on the jury, and may be disregarded. The jury, however, may actually administer any rule of law they choose, and no exception is possible to their views of the law. No one can ever know what it is, and even if known or ascertained by statements made by the jury, presented to the court, would never be heard or looked to as a ground for new trial.

It has been repeatedly held that affidavits showing the jury had mistaken the law or misunderstood it as given by the court, make no ground for new trial. Certainly, if this be so, the fact they had made a mistake in what the law was, as arrived at by themselves, could not be inquired into for the purpose of affecting their verdict.

Plainly the theory involves the absurdity, that an error of the judge may be revised, yet an error of the jury as to the law, which may be fatal to the prisoner, can never be; yet, on the theory, they are both equally judges of the law,—the jury, however, having the most effective right, as they may regard or not the charge of the court, and act independent of it, while the charge of the judge may be revised by this court.

In the case of *Hamilton* v. *The People*, Amer. L. Register, vol. 13, p. 688, the Supreme Court of Michigan has well stated the true principle, and argued its correctness with unanswerable force. The court say: "The precise definition of a jury's rights in criminal cases is easier understood than expressed. Their de-

cision upon a prisoner's guilt or innocence can never be directly reviewed, and upon an acquittal there can be no new trial.   But the judge's charge in criminal cases is one of the traditionary incidents of a trial, and the great body of authority holds it is meant for the guidance and instruction of the jury, and entitled to their respect."   As we have seen, under our Constitution, in libel cases, they are to exercise their power *under* the direction of the court, and it is also recognized that this is the established rule in all other criminal cases.

The court, in the above case, continues:  "The jury system is generally regarded as deriving one of its chief advantages from having the law applied to the facts by persons having no permanent offices, as magistrates, and who are likely to get the habit of disregarding any circumstances of fact, or of forcing cases into rigid forms and arbitrary classes.   It is especially important, when guilt depends on intention, to give full weight to every circumstance that can possibly affect it, and professional persons are constantly tempted to make the law symmetrical by disregarding small things.   But it is necessary for public and private safety that the law shall be known and certain, and shall not depend on each jury that tries a cause.   The interpretation of the law can have no permanency or uniformity, nor can it become generally known except through the action of courts.   But if the court has no voice (or, we add, only a subordinate one) in laying down these rules, there can be no security whatever either that the innocent may not

be condemned, or that society will have any defense against the guilty. A jury may disregard a statute as freely as any other rule, and a fair trial would, in times of excitement, be almost impossible. All the mischief of *ex post facto* laws would be done by irresponsible tribunals and authorities wholly irresponsible, and there would be no method of enforcing many of our most important constitutional and legal safeguards against injustice. Parties charged with crime need protection of the law against unjust convictions quite as often as the public need it against groundless acquittals. Neither can be safe without having the rules of law preserved, and beyond the mere discretion of any one."

We think all this sound reasoning and true philosophy. The true principle of our law is, that the jury are to receive the law from the court—are to judge of its application to the facts, of which they are the exclusive judges, and following the legal direction (or *under* it, in the words of our Bill of Rights), shall say whether the party is guilty or innocent. They may err in their conclusions in favor of the prisoner, and acquit a guilty man. This can never be reviewed, and is a settled principle of our law; but this is what may occur in the action of all human tribunals. But the end of all investigation in courts is to administer the law and enforce legal rights— rights previously known and understood. To establish the principle, that a jury, if mentally uninstructed in the law, is the most competent tribunal to say what that law is, and may disregard the opinions of courts

of trained and educated lawyers, is to make such investigations a farce, and leave them to their own wills. To hold that this is a legal right of the jury, is to give them the authority of law for lawless, unguided action—to give ignorance, by law, the precedence over knowledge in the administration of the law in every criminal trial, and leave us no law but such as may be eliminated by a jury on its retirement for the decision of that particular case. This can never be known, therefore can never be established as precedent to guide future juries, even if worth preservation; and so we are compelled by this process to improvise to a great extent; and it *may* be done of *right*, under the theory, in every trial, if the jury so conclude and assume to know the law better than the court. The worst feature still of all this is, that in cases of the most intelligent and upright juries, canscious of their want of legal knowledge, the instructions of the court will be followed, but in cases of ignorant and corrupt juries (and such are possible at least) we are always likely to have the law as given by the court disregarded, and the crude or corrupt conclusions of ignorance or corruption made the standar1 for decision.

The most competent juries to judge of the law, will never be likely to assume such responsibility; the most incompetent and corrupt will be the sole practical repositories for the exercise of this high judicial prerogative. No such rule having such results can possibly be sound, either in theory or practice,—but can only be evil, and that continually.

The principle we have maintained in this opinion

is properly and well stated in the conclusion of the opinion of this court in the case of *Dale* v. *The State,* 10 Yer., 555. In that case the circuit judge had said to the jury: "The jury are the judges of the law as it applies to the facts; they are the exclusive judges of the facts; but in making up their verdict they are to consider the law in connection with the facts, but the court is the proper source from which they are to get the law. In other words, they are the judges of. the law as well as the facts, under the direction of the court." This was held to be correct, and in accord with the opinion of the court in the case of *McGowan* v. *The State,* 9 Yer., 195, which opinion, after mature consideration, we reaffirm. This statement of the rule in that case, we reaffirm as correct, and overrule such of our subsequent opinions and *dicta* as seem to countenance the opposite theory.

We conclude this discussion by a quotation from the language of Lord Hardwicke, in the case of *Rex* v. *Poole,* Cases temp. Hard., Amer. L. Reg., vol. 13, p. 300: "It is of the greatest consequence to the law of England, and to the subject, that the powers of the judge and jury be kept distinct; that the judge determine the law, and the jury the facts; and if ever they come to be confounded, it will prove the confusion and destruction of the law of England."

We deem it equally important to the people of Tennessee that such shall be the rule, that every man may know by what law he shall be tried, and that offenders may feel sure that the whims, caprices or prejudices of a jury may not be relied on to acquit

the guilty, but that the law of the land will be the guide of the tribunal by which they must be tried—that law as known by the judge,—and thus the evil-minded be deterred from the commission of crimes, while the innocent may feel that all the protective guaranties of that same law will be faithfully held over him as his shield and protection, in times or circumstances of excitement, by the steady hand of a judge, who not only seeks to administer the law of the land, but knows what it is.

The majority of the court, however, think that we can clearly see that the error discussed has not prejudiced the prisoner in this case—that it was, in fact, favorable to him, and gave him a chance that, under the law as given correctly by the court, he would not have had; that if there had been any error of law in the action of the court that would have worked him injury, we would have reversed; but that the court having substantially and correctly given the rules of law to the jury, and they have, as all think, beyond question, found a correct verdict, in accord with the law and the facts, the judgment must be affirmed, and it is so ordered, but I cannot assent to this conclusion.

It is settled law, uniformly followed in this court, that for a material error in stating the law to the jury by the judge, this court will reverse. This principle goes on the idea that the jury are to be guided by the rules of law as known and established applicable to the case in hand. It would seem to follow necessarily, if the judge, while stating the law with

substantial correctness on the main feature of the case, or even all of them, as the facts may appear in the record, has still left the jury free, as a matter of legal right, to follow any other guide than the law as given them, the case, as I think, should be reversed. How can we say which rule the man was tried by—the one given by the court, or one improvised for the occasion by the jury? Where two rules or lines of conduct were open to the jury, the one equally legal with the other, and the jury left equally free to follow the one as the other, can we say they *were* guided by the proper one, or that the prisoner was tried according to the law of the land as declared by the court? We have nothing by which to be guided as to how this is from this record. We see it might have been either way. There certainly is no presumption in our law that a jury will decide the law correctly; so that we have the case, in fact, of a jury left to try the party by their own judgment if they so choose, and no presumption either of law or fair inference of fact that they will not exercise what they are told is their legal right. If it is not fatal error in a court to permit a jury to find the law as they may conclude, then it seems to me it would not be to erroneously instruct them himself. The evil is much worse in the case of the jury, for it cannot be revised, but in the case of the judge we can see what he has done. This is worse than misinstruction by the judge; it is leaving the jury to make and follow any law they may agree on, with no corrective whatever or check—and still worse, with no directions to

Railroad Company v. Selcer.

guide them in their investigations, except as they may choose to conclude.

For these reasons, I think the judgment should be reversed, but a majority of the court thinking otherwise, the judgment will be affirmed.