STATE OF IOWA, Appellee, v. WILLIAM KIRK, Appellant.

CRIMINAL LAW: Self-Defense—Defendant the Aggressor—Avoid-
1　ing Necessity to Kill—Jury Question. Self-defense does not
justify a homicide if defendant is the aggressor, or if he failed
to do everything in his power, consistent with his safety, to
avoid the danger and avert the necessity of killing.

PRINCIPLE APPLIED: Defendant, 45 years old and a good
shot, killed his wife, who was somewhat older, he weighing 130
pounds, she 160 pounds. Divorce proceedings brought by her and
consequent bad feeling existed. He armed himself with a re-
volver, and, ostensibly to buy a cigar, went across the street,
where his wife was. A quarrel ensued. He accused her of
lying. She left the store for her home 500 feet distant. Defend-
ant followed on opposite side of street. She walked rapidly and
dared defendant to come over. Defendant replied: "Never
mind, I will get you yet." Defendant claimed he and his wife
had arranged to meet at her gate that evening, he having been
enjoined from going on her premises. Several shots were heard—
some said four, some five, some seven. The first three shots came
in rapid succession, then a pause, then one, two, three or four
shots. She had four wounds, two fatal. Powder marks were
on her person and clothing. Revolver with three empty and three
loaded shells lay near her left hand. It was dark. No witness
except defendant. He claimed he was trying to peacefully adjust
matters; that she became very nervous; had her hands down or
behind her, talked loud and stepped back, and calling him a
vile name, fired three shots in his face, though he was not hit.
He says he slipped slightly and did not know how many times
he shot. He admitted she was within seven feet of him. An
expert said the revolver must have been within six inches of her
person. She screamed immediately after the first three shots.
She was somewhat addicted to the use of intoxicating liquors,
was of violent temper, was jealous of him and had threatened
his life. Conflict as to her peaceable disposition. *Held,* whether

defendant was the assailant or whether he acted in the reasonable apprehension of imminent peril to his life or person was fair question for the jury.

CRIMINAL LAW:   Demonstrative Evidence—Clothing, Identifica-
2   tion of.   Whenever an object cognizable by the senses has such relation to the fact in dispute as to afford reasonable grounds of belief respecting it, such object may go to the jury, *provided* it is attended with such showing that the jury can judge of it substantially as it was *when the fact in dispute arose.*

PRINCIPLE APPLIED:   In instant case, above rule held violated as to certain clothing but error held non-prejudicial, because the killing was admitted and the only inference possible to be drawn from the clothing of deceased was from powder marks on the waist, which was sufficiently identified as to sameness of condition.

HOMICIDE:   Expert Opinion—Recent Firing of Gun—Admissibility.
3   The opinion of an expert must be based on a condition existing *at the very time in issue.*

PRINCIPLE APPLIED:   Defendant claimed that deceased fired at him and that he—defendant—fired in self-defense.   A revolver, partly loaded and partly empty, found near deceased's left hand, was taken by the coroner from the side of deceased the night of the shooting, examined by him, given to the sheriff the next morning, kept locked up by the sheriff in his house, later given for short time to another party who was investigating, after which it was delivered to another party, apparently the prosecuting attorney.   An expert examined the gun some 36 hours after the death of deceased and expressed the opinion it had been very recently fired.   Later he examined it again and at the trial testified the gun had not been fired as recently as the day on which deceased was killed.   His last opinion was based on the dark, rusty and dirty appearance of the inside of the barrel (all other evidences of firing having been obliterated by handling) and on the presence of rust, dust, leaves like tobacco, a shred of paper, all of which he admitted would cause blackness. There was no evidence as to how or where it had been kept, used or carried or whether it had been exposed to dampness or dust prior to the examinations by the expert.   *Held,* above rule violated and expert opinion improperly received.

CRIMINAL LAW:   Misconduct of Jury—Examination of Code—New
4   Trial.   Misconduct of the jury, if of such character that it likely did influence the result of the trial, or this may be said to have been reasonably probable, is sufficient to demand a new trial.

PRINCIPLE APPLIED: After some deliberation, the jury procured a Code for the sole purpose of learning the punishment for the offenses charged and included in the indictment. They did not know or learn of the ''indeterminate sentence law.'' Result, erroneous conception of punishment. Prior to this seven had voted for manslaughter, one for second degree murder, four for acquittal. Verdict, manslaughter and mercy. *Held*, new trial was necessary.

*Appeal from Johnson District Court.*—HON. R. P. HOWELL, Judge.

SATURDAY, DECEMBER 19, 1914.

THE defendant was indicted for murder in the first degree and convicted of manslaughter. He appeals.—*Reversed and Remanded.*

*George Cosson*, Attorney General, *Wiley S. Rankin*, Special Counsel, *W. R. Hart*, and *C. S. Ranck*, for appellee.

*Wade, Dutcher & Davis, O. A. Byington*, for appellant.

LADD, C. J.—The defendant shot and killed his wife, Frances E. Kirk, September 6, 1913, and was put on trial the 29th day of the same month. He justified by pleading self defense. They had lived in Iowa City about a year and one-half and were engaged in selling Indian Medicine remedies, he being of Indian-Portuguese extraction and she a French-Canadian. He was forty-five years of age and she some years older. She had begun an action for divorce and had procured a writ of injunction restraining him from visiting the premises previously constituting their home. Negotiations for the adjustment of her claim for alimony were pending, though she had declined an offer made by him, and his attorneys had advised him to see his wife and try to reach an agreement. In the evening of September 6, 1913, he had been sitting on his porch without coat and with shoes untied and, at about 7:30 o'clock, took a revolver he had purchased

1. CRIMINAL LAW: self-defense: defendant the aggressor: avoiding necessity to kill: jury question.

three months before from a dresser and walked across the street to Kostal's store, ostensibly to buy a cigar. His wife who was sitting on the store porch, went in and a discussion between them followed concerning some rent she had collected and the adjustment of her claim of alimony. Evidence that he told her that she had lied in saying she had left the rent with her attorney was undisputed and the character of their controversy may be inferred from the fact that Kostal requested them to leave the premises and accompanied her about 100 feet on her way home, some 500 feet distant, while Kostal's wife advised her to remain. The defendant went the same way, though out in the street or on the opposite side. She appears to have walked rapidly and when across an intervening bridge about 200 feet long, according to Nettie Eagan, then 13 years old, dared defendant, who was on the other side, over, to which he responded: "Never mind I will get you yet." The defendant testified that he told her he wanted to talk with her this evening and that they there arranged to meet at her gate. After they were there a few minutes, several revolver shots were heard, some witnesses saying four, others five and still others as high as seven. When found she was lying on the ground dead with four wounds, two of which were necessarily fatal. Two bullets entered the left shoulder, one the neck and the other the fleshy part of the left arm. Powder marks were on her clothes and person. A nickel-plated revolver with three empty and three loaded shells was lying in or near her left hand. It was dark and there was no eye-witness other than the defendant. All the witnesses agree that the first three shots were fired in rapid succession and that then there was a pause and thereafter one, two, three, or four shots were fired, the greater number fixing them as two after the pause.

The defendant testified that after a few words had passed, he had said:

"You know next week that divorce case is coming off

and my purpose over here is to compromise, to see if I can compromise with you. You seen your lawyer and I seen mine. You know about the property and that is what I want to see you about. My lawyer says to see you if we couldn't compromise and I said I would be willing to give you $1,000 and you get a divorce and it would be all right. I didn't want any notoriety at all. Enough notoriety here the way it is. She got awfully nervous. She was standing in the gateway and stepped back just a little bit. She had her hands behind her or down rather. Then she commenced awfully loud. She says, 'I have seen my lawyer and you seen your lawyer,' she says, 'I will tell you what I want. I want $1,500 and half the medicine and the right to sell my medicine.' I says, 'If you are going to fuss I am going home.' She talked pretty loud. I had my hand on a picket, there was a picket fence. It was a little wider there and a very small terrace place anyway. She had a gun and the fire went right in my face almost. It was so close. I had a blue steel gun in my hip pocket and I slipped just then. I slipped a little just as I said, 'I am going home,' and I pulled myself up right by the side of the fence with my hand on the picket. Before she shot she says, 'You black son-of-a-bitch, I will get it all.' I shot, I don't know how many times. I do not know how many times she shot. It was all done in a flash.''

Nettie Eagan testified to seeing him walk over to the gateway, place his left hand on his wife's right shoulder, his right hand by his side and that her hands appeared to be down and that within three minutes she heard three or four shots. The defendant was known as Dr. Deerfoot. Though not a practicing physician, he had traveled over the country selling medicines for others or himself since attaining maturity, was a good shot and had married the deceased 18 or 19 years previous, she being his second wife. She had been a snake charmer in a circus, was somewhat addicted to the use of intoxicating liquors, of violent temper, was jealous of him,

and had threatened his life. The evidence was in conflict as to whether she was peaceably disposed. They were of the same height, she weighed 160 or 170 pounds while his weight was only 130. It is impractical to set out all the details. Enough of them have been mentioned to indicate that the issue of self-defense was for the jury. The theory of appellant is that his wife fired three times and thereupon he discharged the four bullets into her person. But if she discharged the revolver, none of the bullets hit him and this he may have known before he fired. She was within a few feet of him as the powder on her dress proved and he admitted she was within seven feet. An expert was of the opinion that his revolver must have been within six inches of her shoulder. In these circumstances was it necessary for him to take her life in order to protect his own? There was a pause after the first three shots; if she had fired these did she then quit and if so, might he not then have seized her revolver rather than have shot and killed her? Again, some witnesses testified that, though in a situation to hear, they heard but four shots; if so, the defendant must have fired them. The evidence tended to show that she screamed immediately after the first three shots; if so, was this because of being wounded or owing to fright when defendant drew his revolver? If but four shots were fired the infliction of the wounds must have occasioned the scream. Moreover, the defendant might have been found to have armed himself with his revolver and to have gone over to the store for the purpose of interviewing the deceased and bringing on trouble and to have followed her home with that purpose as well as to talk with her concerning the alimony to be allowed her in the divorce suit. So that under the evidence the jury might have concluded that the deceased did not fire at defendant or that if she did fire he could have disarmed her and thereby protected himself without taking her life or that because of being the assailant he could not avail himself of the plea of self-defense. What we have said indicates with sufficient clearness that the finding

that defendant did not act in the reasonable apprehension of imminent peril to his life or person has such support in the record as to preclude any interference by this court.

II. The clothes worn by the deceased were introduced in evidence over objection that they were not shown to have been in substantially the same condition as at the time of the shooting. With reference thereto, the coroner testified that he identified them without question and he was handed the waist and explained how it was worn and pointed out where the bullets passed through it.

2. CRIMINAL LAW: demonstrative evidence: clothing, identification of.

Q. "Now can you from your knowledge of affairs determine whether or not those black marks, what is this black mark?"

A. "These powder marks are the same as they were when I had the body in my possession."

Q. "Tell from what knowledge you have of affairs what those black marks are?"

A. "Powder marks show that the gun must have been very close to the body when fired."

Q. "Now is that in the same condition at this time that it was when you took it from the body, taking into consideration the effects of the elements upon the blood?"

A. "Practically the same condition."

The corset was then handed to the witness and identified as that taken off the body of the deceased. All the clothes were then introduced in evidence over objection. None other than the jacket were shown to be in the same condition as at the time of the shooting.

The witness was asked:

Q. "Has this clothing been in your possession ever since?"

A. "Why, I have had it at Snyder Bros. in their possession."

It is manifest that there was error in receiving the clothes other than the jacket without any showing that they were in substantially the same condition as when removed from the body of the deceased. However, as the killing was admitted, the only bearing of this testimony was with respect to the powder marks as tending to show how near the revolver must have been at the time of being discharged and, as will be observed, these marks were shown to have been the same as when the coroner took charge of the body; so that while there was error, it was entirely without prejudice.

III. Wesley Kubichek was called as an expert to testify how recently the revolver found by the body of the deceased had been discharged. In qualifying, he testified that his father before him was a gunsmith, that he had manufactured guns but had ceased to do so five years previous, that he was "constantly handling, repairing, and fixing guns that had been loaded and unloaded, fired and not fired. . . . If it (barrel of the revolver) is not handled or rubbed off, it is not difficult to tell whether the revolver has been shot or not within a space of 3, 4, or 5 days after it has been shot."

3. HOMICIDE: expert opinion: recent firing of gun: admissibility.

The revolver in question was first examined by him at the sheriff's office at about eleven o'clock in the forenoon the Monday after the Saturday of the shooting and he expressed the opinion to the coroner's jury, being there asked whether he had any way of definitely knowing for certain whether the "Gun had the appearance of having been fired say two days ago or four days ago or six days ago." "It is more in two days than it would be later on. It shows very recent firing." This was changed somewhat before the grand jury and on the trial he testified that at the first examination—

"The light was rather poor. It was a dark rainy day. The light wasn't very good in the room. I made a close test at another time right after the next day after the coroner's jury. Got a bright light. I had it in the sheriff's office. I

couldn't go by the signs around the cylinder. They were all wiped off. The revolver was carried around in the pockets. If there was any signs of fresh shooting, it was wiped out entirely all around. The only thing that remained was the inside of the barrel and that inside of the barrel was all black.''

Q. ''What did that indicate?''

A. ''Now, that puzzled me because I seen this cartridge that was in there empty indicated smokeless powder was shot out of it and the barrel showed all black and the smokeless powder when shot out of the barrel wouldn't make the barrel black. Indeed it kinda puzzled me. I went down and asked the sheriff for the loaded shells that were left and those were loaded with smokeless powder.''

Q. ''Go on and tell whether you made any microscopical examination of the barrel and inside.''

A. ''I had a little wire with a clean cloth and wiped that sediment out and find out whether there was black powder or smokeless powder shot out, but what I got out was dust and a little foreign matter that is not contained in powder and the barrel looked bright. After that I took and wiped it out with a clean piece of cloth, then I looked into it with a magnifying glass and found it was mostly dust, something like dirt. Leaves some of it like tobacco or something, a little piece of paper and something like thread. That is what I found.''

Q. ''Would you say as to whether that gun was shot four or five or six days prior to that time?''

Q. ''Sixth day of September?''

A. ''I believe it was before that.''

Q. ''How long could you say that the gun was shot before the 6th day of September?''

A. ''Now, I found by close examination by the color of the cylinder two chambers that it was a little different mark than on the barrel.''

Q. ''Find any rust marks?''

A. "There is rust marks indeed."

Q. "What would you say as to when the gun was shot, whether it was shot on the 6th day of September, 1913?"

A. "By all indications what I have said and the way the gun looked to me as I examined it thoroughly I could say that it was not shot Saturday."

Q. "On the 6th of September?"

A. "Not that barrel."

Q. "Are you sure of that?"

A. "Yes, sir." On cross-examination, he testified:

"When it is a recent firing you will find marks all around the holes in the chamber. It will be formed in a star in all directions. The explosion forms gases. These gases explode between the barrel and they leave a coloring like on the steel where they touch. That is caused by the gases. The explosion of the gases colors the surface. The color is caused by recent firing. That is a substance destroyed by touch. A mere touch erases them. After a recent firing, if it is touched in any way it destroys it. After it remains it turns darker. It gets darker and darker until it dries up. It begins to darken after a while, not right away. A couple of days it will stay nice and bright. It depends upon a great many different conditions as to how long it will remain and how bright it will remain. If it is dry weather it is likely long, but wet weather will cause it to form rust quick. The appearance you see is simply a little dust in the color, that is all that it is. It is bluish gray color. It is a little more of the grayish color. A person who wasn't an expert would look at one of these things and never detect the difference. I can detect it. . . .

"I had a Colt and a Smith & Wesson, different prices and they showed the same sign as this. I made a test as to the length of time it would remain there. It is along three, four or five days. The quality of the steel would make no difference in the appearance. I did not make any test as to the quality of the steel in the cylinders of the different guns. I have no means of making a test of examining the bright steel

gun again. It had been fired just as I said not that night, a few days before that. The first examination, I made no examination of the barrel.

"I did the second examination. The reason for the difference in my opinion is based on the examination of the cylinder alone. I mean the inside of the barrel. I have no knowledge of how many pockets the gun had been carried in since it had been discharged. I found dirt and dust in the barrel. Don't know whether it came from the pocket or lying in the dust. The dirt was there. That would make a difference in the appearance of the barrel. The evidence for changing my opinion is that the barrel was black. To shoot black powder in a barrel will blacken it and particles of dust will cause it to turn black. The carelessness with which it is handled and the amount of dust you get in the barrel materially cause it to change, to blacken and change its appearance. If you take a gun after it had been shot and stick it in the pocket and get some dust in the barrel, that would blacken the inside of the barrel, if the pocket was filled with dust. The character of the weather would not change its appearance if you shot smokeless powder, not that way in a couple of days. I made a test of that kind. The barrel of the gun on the inside for five or six days would look the same in damp or clear weather. It is constant process, but for a while it will remain about the same, so slight you could hardly detect it, but it is a process that is going on constantly. It is simply a matter of the extent to which it affects the barrel as time goes on. When I said before the coroner's jury that the gun had been recently fired what puzzled me was the small ring around or color looked a little brighter than the rest that indicated firing within a few days. Q. If that did not indicate very recent firing. Tell me why you said that, if it didn't?"

A. "It indicated firing, it did indicate that little spot what I could detect by that poor light without any instruments without any appliances to make any test, I had no chance to test it there."

After stating that he did not mention poor light before the coroner's inquest he went on to say that "If you drop dirt in the end of the barrel it would show that there was some dirt part way in it anyway, it would look dark, blacker, lint inside of the coat pocket would make it look darker if plenty of it. It covered the rifling, you could not see the rifling at all. There was a lot of it in the barrel of the gun when I examined it the second time. . . . I made a test with a glass as I told the jury and reached the conclusion that the gun was not fired September 6th . . ."

We have set out this evidence in order to indicate the competency of the witness and the plausible, not to say convincing, character of the evidence. As the issue whether the deceased discharged the three chambers of the revolver was directly involved, the evidence had a direct and important bearing on the decision reached by the jury, and, if erroneously received, must have been extremely prejudicial. The objection was interposed in substance that the evidence failed to indicate in whose possession the revolver had been or that it was in the same condition when examined as at the time of the shooting. This was overruled. The coroner testified to taking the revolver from the side of deceased, and examining it that evening and the following morning and that he then handed it to the sheriff. The latter said that he kept it locked up at his house except when he allowed Burger to take it downtown to see where it was bought and that it had the same number of shells when returned as when Burger took it and that he then turned it over to Hart. There was no showing whatever as to how or where the revolver was carried or kept; whether it had been exposed to dampness or to dust or lint or in what way it had been used nor any proof that it was in substantially the same condition when examined by Kubichek as when taken from beside the body. The witness conceded it might have gathered dust or lint from a pocket, if carried there, and that dust or dirt might be the occasion of the dark appearance of the chambers upon which he seems

to have largely relied in expressing his opinion that the revolver was not discharged as recently as on the evening deceased was killed. The principle exacting proof that conditions under which examination is made and at the time in issue are substantially the same is elementary and no argument is essential to sustain it. Without such proof, the court was without assurance that conditions on which the testimony was based did not arise or were not created subsequent to the tragedy and therefore that the evidence had any necessary bearing on the probability of the revolver being discharged on the night in question. In receiving the evidence without exacting this necessary foundation the court erred and as the evidence received was of controlling importance, the error was prejudicial.

IV. After the cause had been submitted to the jury and they had deliberated thereon for some time, one of the jurors asked the bailiff in charge if he knew what the penalty for

4. CRIMINAL LAW: misconduct of jury: examination of code: new trial.

manslaughter was and being answered in the negative, requested a Code of Iowa. Thereupon, the bailiff handed the Code to the foreman. One of the jurors then read the penalties for the offenses included in the indictment but did not find or know of the indeterminate sentence law. Prior to this, seven jurors had voted to convict of manslaughter, one of murder in the second degree and four for acquittal. About two hours later, the jury agreed that the verdict should be for manslaughter with a recommendation of defendant to the mercy of the court and such a verdict was returned. The affidavits of three of the jurors who had voted for acquittal were to the above effect and that they believed that it was within the discretion of the court to give the defendant a sentence for any period not exceeding eight years and a fine in any amount not exceeding $1,000. Juror Bliss in addition to the above swore that "one of the jurors made the recommendation a condition to agreement to the verdict and that because of their understanding of the penalty as stated, they

agreed to the verdict.'' He and Verry, in an additional affidavit, swore that they ''voted with the express understanding . . . that the minimum penalty should be given'' and ''believed and supposed that the judge had the power to impose a nominal or minimum penalty and that, under the recommendation of the jury, would do so'' and that had they not so believed they would not have agreed to a verdict. Subsequently Bliss made affidavit that he based his verdict solely on the evidence and was not influenced against defendant by the contents of the Code. Only the affidavit of Verry then can be regarded as asserting the influence of what occurred on the verdict and this portion should be disregarded as inhering in the verdict. Undoubtedly, affidavits of facts occurring in the jury room after submission of the case and even that the jury talked of these are competent. · *Douglass v. Ange,* 125 Iowa 67; *Brown Land Co. v. Lehman,* 134 Iowa 712.

But it is not competent to show by affidavit of jury what influenced the verdict, for this is necessarily mere matter of opinion and essentially inheres in the verdict itself. *State v. Dudley,* 147 Iowa 645. If what occurred, however, amounted to misconduct and was of such a character that it likely did influence the result of the trial or this may be said to have been reasonably probable, it is enough, regardless of any such showing of such influence in fact, to invalidate the verdict and exact a new trial. That it was misconduct on the part of the bailiff to hand the Code to the jurors and of them to receive it cannot be questioned, but whether this can be said to have wrought prejudice to defendant is quite another question. It will be observed that all the jurors ascertained from the Code were the penalties attached to the crimes included in the indictment; that the penalty for murder in the first degree was death or imprisonment in the penitentiary for life; for murder in the second degree, imprisonment in the penitentiary for life or for a term of not less than ten years, and for manslaughter, imprisonment in the penitentiary not exceeding eight years and fine not exceeding one thousand

dollars. Prior to 1907, the district judge in sentencing a prisoner might in his discretion impose the minimum penalty fixed by statute. Thereafter, under the indeterminate sentence law enacted by the Thirty-second General Assembly, in cases other than treason or murder "the court imposing a sentence of confinement in the penitentiary shall not fix the limit or duration of the same but the term of such imprisonment shall not exceed the maximum term provided by law for the crime of which the prisoner was convicted." Sec. 5718-a13, Code Supp. Under this law a board of parole was organized with powers defined in Sec. 5718-a18:

"The board of parole shall have power to establish rules and regulations under which it may allow prisoners within the penitentiaries, other than prisoners serving life terms to go upon parole outside of the penitentiary buildings, enclosures and appurtenances, but to remain while on parole in the legal custody of the wardens of the penitentiaries and under the control of the said board of parole and subject, at any time, to be taken back and confined within the penitentiary; it may, on the recommendation of the trial judge and county attorney, and when it shall appear that the good of society will not suffer thereby, parole, after conviction and before commitment, persons not previously convicted of a felony; and the board shall have full power to enforce such rules and regulations and to retake and reimprison any such paroled convict. The order of said board certified by its secretary shall be a sufficient warrant for any peace officer to arrest and take into actual custody or to return to the penitentiary specified in the order any prisoner conditionally released or paroled by said board; and it is hereby made the duty of all peace officers to execute such order the same as any other criminal process and they shall receive the same fees as sheriff for like services, the same to be paid out of the appropriation made herein, but no person shall be released on parole before the expiration of the maximum term provided

by law for the punishment of the crime of which he was con-
victed until the board of parole shall have satisfactory evi-
dence that arrangements have been made for his employment
or maintenance for at least six months. The time when a pris-
oner is upon parole or absent from the penitentiary shall not
be held to apply upon his sentence if he shall violate the terms
of his parole.''

Sec. 5718-a20 also declares that ''It shall be the duty of
the board of parole to keep in communication, so far as pos-
sible, with all persons who are on parole and when, in their
opinion, any prisoner who has served not less than twelve
months of his parole acceptably, has given such evidence as is
deemed reliable and trustworthy that he is and will continue
to be a law-abiding citizen and that his final release is not in-
compatible with the welfare of society; and when the said
board of parole shall have procured, so far as possible all
facts relating to the history of such paroled prisoner, both
before and after his confinement and parole, and his record
while detained, the board of parole shall recommend to the
governor the discharge of such prisoner from further liability
under his sentence. Said recommendation shall be entered
on a proper record, kept by said board for that purpose, and
a certified copy of the order of discharge, when made by the
governor, shall be filed with the clerk of the court in which
said prisoner was sentenced to the penitentiary. All papers
and documents relating to the pardon of any person shall,
upon the granting of such pardon, become a part of the files
of the governor's office.''

It will be observed that the sentence under the law as
it now stands is to be in the language of the statute defining
the punishment for manslaughter and the only misunder-
standing the jury could have had was in supposing the discre-
tion in making the penalty less severe was lodged in the trial
judge rather than the board of parole and governor and that
involved in defining the extent of punishment in advance

rather than in exacting that this be done on subsequent investigation of his worthiness to clemency. Of course, the jury had no assurance of what the trial judge would do and must have known that notwithstanding their recommendation to mercy, he might impose the full penalty. They were merely imagining what he would do if they entered into that realm at all and if they did there is nothing to indicate that the length of term they may have guessed the court would impose would exceed that which might result from the action of the board of parole and governor. No inducement whatever was held out to them that the slightest attention would be accorded by the court to their recommendation for mercy and the mere fact that they were aware of the penalty which the court was bound to impose in the language of the statute or its equivalent, instead of exercising a discretion as they supposed, ought not to have diverted them from their sworn duty of determining whether the defendant was guilty from the evidence alone, guided by the instructions of the court. Notwithstanding all this, the jury did procure the Code in order to ascertain the punishment to be imposed and this for the evident purpose of taking the punishment into account in determining the issue as to defendant's guilt. Had their information been complete and accurate there might have been no prejudice but in usurping the court's authority to construe the law they overlooked the indeterminate sentence law and thereby obtained an erroneous conception of the punishment to be administered and it cannot fairly be said that they likely were not somewhat influenced thereby. The difference has already been pointed out and no one could well contend that a definite sentence by the court would ordinarily seem to the average man sitting on the jury otherwise than much less severe than the maximum penalty with the contingency of a subsequent parole and pardon.

Instructions that the jury is the judge of the law as well as of facts have been condemned and the sending with the jury of statutes or session laws for their information frequently

has been held to constitute error. *Merrill v. Nary,* 10 Allen (Mass.) 416; *Harris v. State,* 75 Tenn. 538; *State v. Layman,* 125 Pac. (Idaho) 1042.

Also, allowing them access thereto, or to treatises or reports on the subject involved in the trial, has been condemned. *Newkirk v. State,* 27 Ind. 1; *Hardy v. State,* 7 Mo. 607; *Harrison v. Crow Hance,* 37 Mo. 185; *State v. Smith,* 6 R. I. 33; *Johnson v. State,* 9 So. (Fla.) 208; *Burrows v. Unwin,* 3 C. P. 310.

In *Wilson v. The People,* 4 Parker's Crim. Reports, 619, handing a paper on which was written the penalties for the degrees of murder and manslaughter was held without prejudice by the trial judge owing to instructions being subsequently given and the nature of the issue, but the judgment was reversed on appeal because of another error.

In *People v. Gaffney,* 14 Abb. Prac. (N. S.) (N. Y.) 36, the jury had the revised statutes of New York before them defining the offenses of murder and manslaughter during their deliberations and inasmuch as the jury were clearly and fully instructed as to these offenses and their verdict was the only one which could have been returned under the charge, the court held that there could have been no prejudice.

In *Gandolfo v. State,* 11 Ohio. St. 114, the court sent the statutes to the jury on their request with reference to sections which he had probably just read to them and it was remarked on appeal that the court was not able to say this was improper. The jurors are under oath to return a verdict according to the evidence and instructions of the court and therefore are bound to follow the instructions of the court as the law of the case. That is the only legitimate mode in which they can receive the information necessary to enable them to apply to the facts before them the rules by which they are to be guided and governed in the performance of their duty. To allow them to obtain information as to the law from any other source would tend to confuse, as also it would if they were permitted to act on their own preconceived notions of

what the law is. They are expected to follow with scrupulous fidelity the instructions as given by the court. This is essential, not only in order that there may be a uniform and consistent interpretation and application of the rules of law, but also that these be made certain to the end that the rights and duties of litigants be protected and enforced in the courts of justice. Were the practice otherwise, it would be impossible to know upon what theory of the law the jury may have proceeded and although the law may have been laid down by the court with preciseness and accuracy, there could be no certainty that it would be and had been acted upon by the jury and there would be no way of ascertaining the principle on which cases have been determined and therefore no basis for a review. The safe mode of conducting trials is for the court to instruct the jury upon all material points before they retire to deliberate upon their verdict and if they have occasion for further information, let them return to the court and indicate the questions upon which they wish further advice and receive in open court such direction as the judge may deem proper.

The inference is warrantable not only that the jury misconstrued the law in not taking into account the indeterminate sentence law but allowed such misconstruction to influence their verdict. At least, it cannot be said in view of their situation that this did not happen and for this reason, it cannot be affirmatively found that prejudice did not result from the jury's misconduct. The judgment is *reversed* and the cause *remanded.*

DEEMER, GAYNOR and WITHROW, JJ., concur.