STATE OF IOWA, Appellee, v. M. O. KINGSBURY, Appellant.

**INTOXICATING LIQUORS:** Liquor as Evidence—Want of Identification. On the trial of an indictment for the unlawful sale of intoxicating liquors, it is reversible error to receive liquors in evidence, along with testimony tending to show the percentage of alcohol therein, unless it is first established: (1) That said liquors are the liquors sold by defendant; and (2) that, when such liquors were analyzed, they were in the same condition in which defendant sold them.

*Appeal from Audubon District Court.*—E. B. WOODRUFF, Judge.

## JUNE 21, 1921.

THE defendant was convicted of the crime ·of bootlegging, and appeals.—*Reversed.*

*Mantz & White* and *Swan, Clovis & Swan,* for appellant.

*H. M. Havner,* Attorney General, and *T. M. Rasmussen,* County Attorney, for appellee.

FAVILLE, J.—The appellant was indicted by the grand jury of Audubon County, charged with the crime of bootlegging, alleged to have been committed on or about August 13, 1919. The appellant is a chiropractor, living in Audubon. The evidence in behalf of the State tended to show that, on the evening of the day in question, one Roth, a barber, met the appellant in front of the barber shop, and that appellant invited him to come up to his office, which he did. Roth claims that at this time the appellant gave him a drink of whisky from a bottle, and that they talked at that time about the appellant's selling the witness four quarts of liquor. The witness testified that, later in the evening, he met the appellant, and that they took a ride in an automobile, and that the appellant had four quart bottles, which were wrapped in newspaper and tied with a string. These, it is claimed, were delivered to the witness, who paid the appellant $11 per bottle therefor. The witness testified that, after he got the four bottles, he took them to a place near the canning factory, reaching there by a circuitous route through various alleys; that he set them down, opened the bundle, and pulled out a bottle and took a drink; that he just saw the one bottle; and that it had on it a label bearing the words "Old Taylor."

The witness seems to be rather hazy in his recollection as to just when and where the witnesses Campbell and Hansen joined him in the festivities, but testified that they were present at the canning factory, and that they also drank from this bottle. Roth, it appears, was somewhat of a connoisseur, and, after tasting the liquor, expressed himself in no uncertain terms as being thoroughly dissatisfied with his purchase. He immedi-

ately announced to his colleagues, Hansen and Campbell, that
he was going to return to the appellant forthwith, and demand
a restoration of his money. However, he made no attempt to
effectuate a legal rescission of the contract; for he neglected to
return the property purchased, or otherwise to place the appel-
lant *in statu quo*. Whether or not he deemed the merchandise
contraband and subject to confiscation does not appear; but,
while gone on his mission to receive restoration of the purchase
price, he left the liquor in the custody of his two associates,
requesting Hansen to take care of it during his absence. Hansen
testified that he put the bottles in an old barn, which was open,
and left them there. Roth claims that he saw the appellant and
got his money back, and that he then fell in with three other
companions, Foley, Phillips, and Nelson, who accompanied him
to the vicinity of the Hansen barn. Hansen took Roth to the
barn, where he got four bottles and took them away in an auto-
mobile, accompanied by his three friends. These parties then
went to a place described as the "Nash Bridge," on the out-
skirts of the town, where, with these new comrades, Roth again
sampled the contents of the bottle which had been opened. Not
being reassured regarding the quality of the stuff by this ex-
perience, Roth placed the four bottles in the weeds by the road-
side south of the Nash Bridge. A paper was wrapped about
them and the necks were exposed. The bottles were not sealed,
but were closed with ordinary corks. The evidence discloses
that the bottles were placed "in the moonlight," but no claim is
made that the "moonshine" had anything to do with the quality
of the contents. After depositing the bottles, the four parties
returned to the city together, and from that time on, Roth dis-
appears from the scene. Nelson was not a witness at the trial,
and his whereabouts after the bottles had been cached near the
bridge is likewise unexplained.

Some time later during the night, Foley and Phillips, how-
ever, returned to the bridge, located the bottles, and took one
of them away. They took it to the office of a physician in the
city, at about 2 o'clock in the morning, and delivered it to the
physician, who placed the same on the floor in his office, behind
the door. The office was unlocked, and he left it there until the
following morning, when he met the sheriff on the street and told

him of the circumstance of the bringing of the bottle to his office. The sheriff went with the doctor to the latter's office and received from him the bottle, which he took and put in the jail, where it remained until some time in November following, at which time the sheriff placed a portion of it in another bottle, which was sealed up and delivered to a chemist in Des Moines. The chemist subsequently analyzed this sample, and testified that it contained 20.06 per cent alcohol and was intoxicating.

Reverting to the night in question, it appears that, after the transaction hereinbefore detailed, some time in the early morning hours, the witness Foley returned to the Nash bridge for the second time. This time, however, he went alone. He claims that he found the three remaining bottles reposing in the weeds by the roadside. These he rescued and carried to the city dump ground and hid in the blue grass near the fence. The dump ground was a place where the refuse and debris from the city were deposited. Here they might have been utterly lost to human ken, had it not been for the vigilance of the city marshal. Some time in August, it being impossible for him to fix the date, this official was mowing weeds with a scythe near the city dump ground fence, when the point of the scythe struck a bottle and broke it. The marshal thought that he detected the odor of liquor. He investigated. He found a broken bottle, and near by he found two other bottles intact. He discreetly did not disturb these, but, having mowed the grass from around them, left them untouched, and later informed the sheriff of his discovery. The sheriff in due time went to the dump ground and secured the two bottles and the fragments of the broken one. The contents of one of these bottles were afterwards sent to the chemist, who analyzed it and found that it contained about 30.08 per cent of alcohol. The sheriff identified one of the exhibits produced upon the trial as being the bottle he had received from the doctor, and three other exhibits as being the two bottles and the broken one that he had found at the dump ground. They were all quart bottles. None of the other witnesses were able to in any way identify the bottles produced at the trial as being the bottles they had previously seen, or as being the bottles testified about in connection with the transaction alleged to have taken place with the appellant.

It is urged by the appellant that the identity of these exhibits was not established by that degree of proof required in criminal actions to permit the introduction of the exhibits in evidence.

The vital question in the case is whether or not the liquor claimed to have been purchased of the appellant by the witness Roth was intoxicating liquor. This is established, if at all, solely by the chemical analysis of the contents of the two bottles. The witnesses who sampled the one bottle were unable to classify the contents in any manner. Unless we are to overrule the established precedents and the well-recognized rules of evidence in regard to the identity of exhibits of this character, there was no sufficient identification to permit the introduction of these exhibits in evidence. Not one of these witnesses, except the sheriff and the chemist, testified that the contents of these bottles were not changed in any manner while under their custody or control. It is very apparent that the bottles were left where they were easily accessible to parties who knew of their location, and that they could easily have been tampered with, or have been replaced by others. Of the two bottles that were analyzed, there was a difference of 10 per cent in the alcoholic contents. There was no sufficient proof that the bottles claimed to have been purchased from the appellant were the bottles offered in evidence, or that, if they were the same, their contents were in the same condition when analyzed as when purchased. The preliminary proof in this respect is for the court, and, unless there is such preliminary proof of identity, it is error to admit the exhibits and the proof of their contents to be received in evidence. *State v. Cook,* 17 Kan. 392; *State v. Hossack,* 116 Iowa 194; *State v. Phillips,* 118 Iowa 660; *State v. Kirk,* 168 Iowa 244; *Sullivan v. State,* 83 Tex. Cr. 477 (204 S. W. 1169).

It was, therefore, error to permit the witness Jordan to testify as to the chemical analysis of the liquor examined by him, because there was no sufficient identification of it as having been procured from the appellant, or that the contents of the bottles from which this liquor was claimed to have been taken were in the same condition then that they were in when obtained from the appellant, if they were so obtained.

Because of the error in the receipt of this evidence upon the record made, the judgment of the district court must be, and the same is,—*Reversed.*

EVANS, C. J., STEVENS and ARTHUR, JJ., concur.