IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 10, 2006

## STATE OF TENNESSEE v. THOMAS RICHARDSON, JR.

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-03194     Joseph B. Dailey, Judge**

---

**No. W2004-00508-CCA-R3-CD  - Filed May 1, 2006**

---

The defendant, Thomas Richardson, Jr., appeals his conviction for first degree felony murder.  In support of his appeal, the defendant presents three issues: (a) The evidence is insufficient to support the conviction; (b) Two photographs of the victim were improperly admitted; and (c) Hearsay statements were improperly admitted.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. DAVID G. HAYES, J., filed a separate concurring opinion.

Robert Wilson Jones, District Public Defender; and Tony N. Brayton, Assistant Public Defender, for the appellant, Thomas Richardson, Jr.

Paul G. Summers, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Charles W. Bell, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Valerie Richardson, the victim in this case, died October 6, 2001, from severe burns she suffered on the previous day.  Her husband, Thomas Richardson, Jr., was subsequently indicted for first degree felony murder. The indictment alleged that her murder occurred while the defendant was committing an arson.

Inez Crawford, a maternal aunt of the victim, testified concerning events preceding the fire and the victim's death.  Ms. Crawford stated that the defendant had suffered ill health for over two years before the incident.  She said the defendant had become "mean" after his illness.  The defendant had started drinking and smoking and was not as friendly as before.  The victim had planned to move out of the defendant's residence and, with Ms. Crawford's financial assistance, had contracted to purchase a house.  On the Friday preceding the fire, the victim met with a real estate

agent to sign closing documents. Ms. Crawford said that the victim was crying and stated, "He's not going to let me leave the house alive." On the following Sunday the victim repeated this sentiment while meeting with another real estate agent at Ms. Crawford's house. Ms. Crawford said that the victim expressed similar statements in their phone conversations in the intervening time before the fire. The last conversation Ms. Crawford had with the victim was the night of October 4, 2001. At that time, the victim declined Ms. Crawford's invitation to stay at her house that evening. During cross-examination, Ms. Crawford stated that the defendant had worked two full-time jobs prior to his sickness. She said the victim had not filed divorce proceedings against the defendant.

Jeremy Crawford, the son of the victim, was fourteen at the time of the fire. He and his sister, Marquita Crawford, lived with the victim and their stepfather, the defendant. Jeremy returned home after his high school football game at approximately 10:00 p.m. on October 4, 2001. He slept on a couch in the den. His mother, the victim, slept on a facing couch on the south side of the den. He said she had been sleeping there for approximately one year. During the night, Jeremy woke and saw a fiery object sail through the air and land on the victim. Immediately the victim, her covering, and the couch area burst into flames. He stated that he did not look back toward the source of the flaming object. The victim, covered in flames, ran to the living room. Jeremy attempted to put out the flames on the victim with his hands. Fabric was melting on the victim's skin, and her hair was burning. The victim attempted to go out the living room door but could not open it. Jeremy tried to force it open but stated that, although it opened a little, it was as if someone was holding the door. Jeremy went to the defendant's bedroom and attempted to use the cordless phone to call for help. Jeremy was unable to get a dial tone and heard the victim screaming for him in a "little squealing voice." The victim was still by the doorway in the living room where smoke was accumulating. Jeremy again attempted to call his sister who was staying with a friend. Unable to reach anyone by phone, he jumped out a window and ran across the street to seek help from neighbors. The victim slowly followed. A neighbor, Glenda Williams, covered the exposed victim with a blanket. The victim said, "He burned me, Glenda. He set me on fire. He did it." Jeremy stated that he last saw the defendant at approximately 10:30 p.m. in the master bedroom watching television.

During cross-examination, Jeremy stated that the victim did not identify the "he" when she said, "He burned me." He stated that prior to the fire, his mother had planned to move to the new residence on October 5, 2001. Jeremy stated that he had a good relationship with the defendant in earlier years, but that had changed in the last year.

Marjorie Boyland resided next door to the Richardsons. Ms. Boyland said that she had a close relationship to the defendant and the victim and that she felt like they were her children. She related a comment the defendant had made to her several weeks before the fire. The defendant said, "Mom, if you see the police over here, don't worry, I be done killed somebody over here." During the week preceding the fire, Ms. Boyland was having a phone conversation with the victim when the victim stated that the defendant had shoved her and had told the victim he would hurt her and kill her. On October 4, 2001, Ms. Boyland had visited the victim at the Richardson's home. The victim told her that she believed the defendant was going to try to kill her. Ms. Boyland urged the victim to leave, but the victim declined and said she would send the children away. The victim planned to

move her belongings the following day. Ms. Boyland last saw the defendant on October 4, 2001, at approximately 10:00 p.m. The defendant was standing beside the car porch. Later that night, Ms. Boyland was awakened by cries for help and noise at her back door. She saw the victim and the victim's son Jeremy outside. The victim's hair was "swizzled to her head," and her face was unrecognizable. Ms. Boyland had to ask if it was Valerie. The victim said, "Margie, I told you Thomas was going to try to kill me, but he didn't. Thank God I'm still here - thank God I'm still here." Ms. Boyland said the victim's hair was missing and her skin was falling off. During her cross-examination, Ms. Boyland stated that she had not notified police of the threats that the victim had related to her. She said she did not know whom the defendant was referring to in his statement to her about killing someone.

Glenda Williams lived in the same neighborhood as the defendant and the victim. Mrs. Williams testified that she was disturbed in the early morning hours of October 5, 2001, by someone beating on her door. After reporting the fire to 9-1-1, Mrs. Williams heard the victim calling for help. She recognized the victim on sight. Ms. Williams said, "She looked like a monster. She was just burned up." Mrs. Williams threw the victim a blanket to cover herself, then Mrs. Williams started screaming from fright. She told the victim to get out of her house because skin was falling from the victim. The victim told her, "Glenda, Thomas burned me up." Later, the victim told Mrs. Williams, "I was leaving him, and I knew he was going to try something, and he did. He tried to kill me. And he told me he was going to kill me."

In October of 2001, Edna Ward lived diagonally across the street from the defendant and the victim. Ms. Ward testified that both the defendant and the victim were her friends, as well as neighbors. She recounted a phone conversation with the victim which occurred on October 1, 2001. The victim had received news of her loan approval for her new home and was packing her kitchenware. Ms. Ward said that the victim and the defendant were arguing during the phone conversation. The victim then told Ms. Ward, "Thomas said he was going to kill me." Ms. Ward said she offered to allow the victim to stay with her out of fear for the victim's life. Ms. Ward was awakened after 2:00 a.m. on October 5, 2001, by noises outside. She saw the Richardson house on fire and a person going toward Glenda Williams' house. She followed and saw the victim in Ms. Williams' living room. The victim was shouting and praising the Lord. The victim said, "He thought he killed me. Thomas thought I was dead, but I'm not dead." She described the victim as "burned real bad." Her breasts were burned, her skin was off, and only part of her jeans were still on her legs. The victim's hair was burned away, and her ears were melted to her head. The victim said, "Why did he have to do me like this? He didn't have to do me like this."

Officer James Baker was working the midnight shift at the night desk of the Memphis Police Department's north precinct on October 5, 2001. The defendant walked into the north precinct at approximately 5:30 a.m. and told Officer Baker he wanted to turn himself in. The defendant did not specify why he was surrendering himself. When the defendant was asked if the North Meade address on his driver's license was correct, the defendant responded, "Yes, now you know what I've done."

Inspector Kenneth Dabney of the Memphis Fire Department was accepted as an expert in fire investigation. He testified that his investigation revealed one large room, encompassing the kitchen, den, and dining area, was the most heavily damaged area of the house. Extensive fire damage was found there, whereas other rooms only suffered smoke and some radiant heat damage. He stated that the fire originated on the sofa located in the den by the south wall. This sofa had been occupied by the victim. The sofa was tested for the presence of accelerants, and none were found. He opined that if gasoline was the accelerant, traces should have been present on the sofa. However, Officer Dabney stated that the accelerant falling on a person on the sofa could explain the absence of a lack of trace residue. There were charred blanket parts embedded in the floor in front of the sofa. These parts field-tested positive for the presence of an accelerant, and samples were preserved for further testing. Inspector Dabney took the clothing of the defendant for testing but did not obtain any of the victim's clothing. Inspector Dabney's investigation led him to rule out electrical problems or acts of nature as possible causes for the fire. He stated that rapid fires are generally caused by accelerants. During cross-examination, Inspector Dabney admitted that he did not know what substances were on the victim's couch prior to the fire. He stated that he would have expected accelerant residue to be on the sofa where the fire originated.

Laura Hodge was a forensic scientist employed at the Nashville TBI laboratory. She was accepted by the trial court as an expert in fire debris analysis. She explained the carbon-strip-recovery method in testing materials for the presence of ignitable liquids. This method allows a classification of the type of ignitable liquid within certain ranges. The defendant's jeans, sweatshirt, and tee shirt indicated the presence of a gasoline range product. The defendant's cap and both shoes indicated the presence of a gasoline product and also heavy petroleum distillate. Ms. Hodge stated that some shoe manufacturers use heavy petroleum distillate in the manufacturing process which makes it impossible to discern if the indicated presence was from the manufacturing process or exposure to the liquid. The caveat does not apply to gasoline products. A green blanket was also tested, and no trace of ignitable liquid residue was found.

Dr. O. C. Smith, the Shelby County Medical Examiner, testified as an expert in forensic pathology. Dr. Smith performed an autopsy of the victim on October 8, 2001. He stated that the victim suffered burns to 85% of her body surface: 75% of her body surface was third degree burns; 6% was second degree burns; and 4% was first degree burns. Internally, the victim's windpipe was scalded. Dr. Smith attributed the cause of death to burns. The pattern of some clothing was etched on the victim's body. Dr. Smith's testimony concluded the State's evidence.

The defendant, after voir dire, chose to testify in his defense. The defendant said that he and the victim had experienced a "rocky" relationship prior to the fire. He denied threatening or hitting the victim and said he had told her she was free to remove herself from the house. The defendant was asked about activities on October 5, 2001.[1] He said that he had worked washing windows and had returned home just before darkness. The defendant stated that he mowed his lawn and then

_____

[1] The context of the transcript indicates that the defendant was actually describing his activities on October 4, 2001.

walked to the corner of Frayser and Rangeline.  While there, he obtained cigarettes, a half pint of rum, and some Chinese food; he then returned home.  He said that he ate a small amount of the food and then went walking again.  The defendant said he returned home, took a shower, and laid across his bed.  He stated that he did not know if he went to sleep or went walking again but that he was not in the house at the time of the fire.  The defendant's next memory was of talking to a policeman in a car at the north precinct.  He did not remember speaking with Officer Baker.

On cross-examination, the defendant said that although the victim had told him she was leaving, he was not aware of her buying a home.  The defendant was shown three photographs of the bedroom where he said he left his uneaten food.  The defendant agreed that no food was pictured and said he did not remember what had happened.  The defendant denied any history of mental health problems, amnesia, or sleep walking.  The defendant stated he did not know whether he threw a "firebomb" on the victim.  The defendant denied that his statement about killing someone was directed toward the victim.  The defendant claimed that he did not know what part, if any, he had in starting the fire.

Sufficiency

In his first issue, the defendant challenges the sufficiency of the evidence to support his conviction.  More specifically, the defendant alleges that the evidence was not supportive of arson by the defendant, a necessary prerequisite to the felony murder conviction.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); T.R.A.P. 13(e).  The same standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  See State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Although the evidence of the defendant's guilt is circumstantial in nature, circumstantial evidence alone may be sufficient to support a conviction.  State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993).  However, in order for this to occur, the circumstantial evidence must be not only consistent with the guilt of the accused

but it must also be inconsistent with innocence and must exclude every other reasonable theory or hypothesis except that of guilt. Tharpe, 726 S.W.2d at 900. In addition, "it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime." Id. (quoting Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970)).

Arson is committed when one knowingly damages any structure by means of a fire or explosion: (1) Without the consent of all persons who have a possessory, proprietary, or security interest therein. T.C.A. § 39-14-301(a)(1) (1997). As applicable herein, first degree murder is: (2) a killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy. T.C.A. § 39-13-202 (a)(2) (2002).

Viewing the evidence in the light most favorable to the State, there is extensive evidence to support the defendant's conviction of first degree felony murder. Stated alternatively, the proof was sufficient to establish that the victim died as a result of the defendant's act of committing the felony of arson. On the eve of the victim's scheduled removal, the victim's son witnessed a flaming object fall onto the victim. Flames immediately covered the victim and spread to the sofa she occupied. The defendant had last been seen in his bedroom at 10:30 p.m. that evening but was not seen in the aftermath of the fire. Expert proof classified this as a rapid fire, ordinarily associated with accelerants. The defendant's cap, clothing, and shoes tested positive for the presence of a gasoline range product. The fire investigator established that the victim's sofa was the point of origin for the fire. The defendant surrendered himself a few hours after the fire. At the time of his surrender the defendant was asked if the address of his residence on his license was correct. He answered, "Yes, now you know what I have done." The jury could justifiably infer that this was an admission of arson. Before the victim succumbed and while she retained the ability to speak, she repeatedly named the defendant as her assailant. Even the defendant, in his memory-challenged testimony, conceded the possibility that he caused the fire. The defendant's prescience proved to be more acute than his remembrance in that he had remarked to Ms. Boyland prior to the fire about him killing someone in the future. These facts, coupled with the defendant's motive of thwarting the victim's departure plans, gave ample justification to the jury's verdict of conviction. The evidence presented, direct and circumstantial, pointed unerringly to the defendant's guilt.

Photographs of the Victim

The defendant next alleges error in the admission of two photographs of the victim. One was of the live victim prior to the fire and the other was a cropped photo depicting only the deceased's head after suffering the burn injuries. The defendant contends that the photographs were irrelevant, cumulative to the testimony, highly prejudicial, and inflammatory to the jury's sensibilities.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. See State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted). Accordingly, "the admissibility of photographs lies within the discretion of the trial court" whose

ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." Id. Notwithstanding, a photograph must be found relevant to an issue at trial, with its probative value outweighing any prejudicial effect, before it may be admitted into evidence. See State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998). Photographs of a corpse are generally admissible in murder prosecutions if they are relevant to the issues at trial. Banks, 564 S.W.2d at 950-51; see Tenn. R. Evid. 403. Notwithstanding this broad interpretation of admissibility, evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. Banks, 564 S.W.2d at 951.

We first address the photograph of the living victim. The evidence exhibit was a color photograph of the victim introduced through the victim's aunt, Inez Crawford. At the time of introduction, the defendant's counsel objected on the basis that the photograph showed another person and that it was made in church, then added ". . . but I honestly don't find it very prejudicial." In State v. Thomas, 158 S.W.3d 361 at app. 393 (Tenn. 2005) (citing State v. Nesbit, 978 S.W.2d 872 at app. 901-02 n.2 (Tenn. 1998), cert. denied, 526 U.S. 1052, 119 S. Ct. 1359 (1999)), a family portrait introduced in a capital case was held relevant to establish the corpus delecti, including the identity of the victim. Thus, in light of the foregoing authority and standard of review, we conclude that the photograph of the live victim was properly admitted.

The post-mortem photograph of the victim, as introduced, was of the victim's head. It depicted the burns suffered in the area shown. The defendant alleges that the medical examiner's and other witnesses' graphic testimony of the victim's wounds adequately described the horrific wounds. The defendant asserts that the photograph's probative value was outweighed by its unfair prejudice and cumulative effect. The trial judge, in admitting the disputed photograph, commented that the probative value was in allowing the jury to see the extent of the victim's injuries after the fire. The trial judge further stated, "And this is the type of injury that I think is hard to describe with words, adequately and sufficiently, for people to truly understand[.]"

The general rule is that photographs of the corpse are admissible in capital cases if relevant to the issues on trial notwithstanding their gruesome and horrifying character but, if not relevant to the prosecution's case, they may not be admitted to inflame the jury and prejudice the defendant. Banks at 950-51 (citations omitted).

The State contends in its brief that the photograph is relevant for the inference of intent for first degree murder from the manner and extent of the attack on the victim. However, intent to kill is not an element of felony murder, only the intent to commit the enumerated felony. T.C.A. § 39-13-202(b); State v. Bone, 853 S.W.2d 483, 487 (Tenn. 1994), cert. denied, 510 U.S. 1040, 114 S. Ct. 682 (1994).

The testimony of witnesses recalling the victim's appearance after the fire was vivid in its descriptiveness (e.g. clothes melting to her body; skin falling off; hair burned off; ears melted; looked like a monster). The medical examiner, in a more clinical fashion, presented thorough and detailed testimony concerning the victim's wounds. The medical examiner produced a color-coded

chart as an exhibit which outlined in precise detail the locations of the first, second, and third degree burns on the victim's entire body, including the head. We have previously held that where medical testimony adequately describes an injury, gruesome and graphic photographs should not be admitted. State v. Collins, 986 S.W.2d 13, 21 (Tenn. Crim. App. 1998). In this instance, there was no disputed issue which was addressed by the photograph. Although the trial judge exercised great circumspection in excluding many other post-mortem photographs, on balance, it is our assessment that the one allowed was cumulative as well as irrelevant to the issues at trial. Considering the record as a whole and the abundance of other competent, substantial evidence against the defendant, we are convinced that the photograph's admission did not affect the judgment. Thus, we conclude that it was, at most, harmless error. T.R.A.P. 36(b); Tenn. R. Crim. P. 52(a).

Hearsay Statements

In his last issue the defendant contends that hearsay testimony related by Inez Crawford, Margie Boyland, and Edna Ward was improperly admitted. Ms. Crawford testified that the victim stated, "He is not going to let me leave alive." This statement by the victim was made on Friday preceding the fire and later repeated by her in phone conversations with Ms. Crawford. In addition, the victim stated, "Thomas has gotten so mean." The trial court allowed the testimony as a state of mind exception to the hearsay exclusionary rule, pursuant to Tennessee Rule of Evidence 803(3). The statement that "He is not going to let me leave alive" conveys the victim's fearful state of mind at that time. However, the Advisory Commission Comment to Rule 803(3) states: "The commission contemplates that only the declarant's conduct, not some third party's conduct, is provable by this exception." This court, in State v. Leming, 3 S.W.3d 7, 17-18 (Tenn. Crim. App. 1998), held that a homicide victim's statement of fear of the defendant was, in reality, used to prove the defendant's conduct rather than the victim's state of mind. We conclude that the same was true in this case and that the statement was admitted in error.

The statement by the victim, "Thomas has gotten so mean," does not indicate a state of mind but, rather, the victim's opinion. We conclude that it is hearsay and is not subject to admission under any enumerated exception.

The defendant next objects to testimony by Margie Boyland wherein she recounted that the defendant, "some weeks" prior to the fire, stated, "Mom, if you see the police over here, don't worry, I be done killed somebody over here." The defendant contends that the statement should not have been admitted due to its remoteness in time and that it was not against the defendant's penal interests, as he did not confess. These contentions are without merit. The statement was admissible pursuant to Tennessee Rule of Evidence 803(1.2)(A), which provides a hearsay exception for a statement offered against a party that is "the party's own statement in either an individual or a representative capacity." This straightforward and simple exception is not dependent on the statement being against the defendant's penal interests. The statement at issue was an admission of intent and as such was properly admitted.

The defendant also complains of Ms. Boyland's testimony concerning two conversations with the victim. The first was a phone conversation the week of the fire wherein the victim related that she was on the telephone when the defendant shoved her and stated he would hurt her and kill her. Ms. Boyland said the victim was talking loud, fast, and with a trembling voice. The second conversation occurred the day before the fire while Ms. Boyland was visiting at the victim's home. The victim said that she believed the defendant was going to try to kill her. The victim was talking fast while pacing with the phone.

Both conversations were admitted as excited utterances pursuant to Tennessee Rule of Evidence 803(2), which provides an exception to the hearsay prohibition for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The rule embodies three requirements: (a) a startling event or condition; (b) the statement must relate to the startling event or condition; and, (c) the statement must be made while the declarant is under the stress or excitement of the event or condition. State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997).

The victim's first statement to Ms. Boyland clearly met the foregoing requirements. The second statement is somewhat problematic in that the testimony does not explicitly refer to a specific startling event. However, the defendant had, within a week, threatened to kill the victim. The interval of time between the startling event and the declaration is only one consideration in determining whether the statement was made under stress. Id. at 820. The victim was scheduled to move the next day, and her demeanor at the time of the statement exhibited a high level of stress. We conclude that the defendant's earlier threat was not attenuated by the passage of time but, in fact, may have appeared more ominous to the victim in light of her impending move the next day. Accordingly, both statements to Ms. Boyland qualified as excited utterances.

The defendant also objects to testimony by Inez Ward of a phone conversation with the victim on October 1, 2001. At the time of the conversation, the victim was packing her kitchen implements when the defendant approached her. Ms. Ward could hear that a dispute was occurring concerning a television the victim was taking but could not hear the exchange between the victim and the defendant. The victim, according to Ms. Ward, was upset and mad when she said, "Thomas said he was going to kill me." The victim added that she was "getting [her] stuff out of this house." We conclude that the victim's statements are admissible in light of the preceding discussion of the requirements of Tennessee Rule of Evidence 803(2).

Although we have held that two of the victim's statements related by Ms. Ward were improperly admitted, there remains a vast array of competent evidence of the defendant's guilt. In light of that, we conclude that the statements did not affect the verdict but constituted harmless error. T.R.A.P. 36(b); Tenn. R. Crim. P. 52(a).

Conclusion

After a full review of the record, we have found no reversible error. We therefore affirm the judgment of the trial court as entered.

_____
JOHN EVERETT WILLIAMS, JUDGE