STATE of Tennessee, Appellee,

v.

John Michael BANE, Appellant.

Supreme Court of Tennessee,
at Jackson.

March 29, 1993.

Brett B. Stein, William Craig Hall, Memphis, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, Amy L. Tarkington, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

O'BRIEN, Justice.

John Michael Bane was indicted for common law premeditated murder and for felony murder committed during the perpetration of a robbery. In a jury trial he was found guilty of murder in the first degree in the perpetration of a robbery. After a sentencing hearing the jury found that defendant should be put to death by electrocution. The aggravating circumstances warranting the death penalty were: (1) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; (2) the murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of or was attempting to commit, or was fleeing after committing or attempting to commit robbery. T.C.A. § 39–13–204(i)(5) and (7). The jury unanimously found that there were no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstances.

■ At the beginning of the trial objection was made on behalf of the defendant to the reading of the indictment because of its reference to the "grand jurors" and "a true bill" in "big, black, bold print." A further objection was made on the same grounds to the indictment being in the jury room during deliberations because the large print over-emphasized the concept of the grand jury. The trial court overruled the objection. The record indicates that the State's attorney read the indictment without any emphasis on any particular part.

Defendant places reliance on this Court's decision in *State v. Onidas*, 635 S.W.2d 516 (Tenn.1982). His reliance is misplaced. In *Onidas* this Court held that a prosecutor's statements made over objection during voir dire, in which he told prospective jurors that a city judge and grand jury had already determined there was probable cause to believe defendant had committed the crime, were highly improper and, as an attempt to create bias and prejudice against the defendant in the juror's minds, constituted reversible error. *Onidas* does not apply to this case. The prosecutor did no more than read the indictment, which is an appropriate and proper procedure. The indictment at best is a mere accusation to inform the jury of the charges against the defendant. It raises no presumption of guilt. It is purely hearsay, being merely the conclusion or the opinion of the grand jury based on ex parte evidence. *See Onidas* at p. 517. The trial judge in this case properly instructed the jury to this effect. The issue is without merit.

■ Defendant questions the sufficiency of the evidence to warrant his conviction and argues a rational trier of fact could not have found him guilty beyond a reasonable doubt. Defendant was convicted of the first-degree felony murder of Royce D. Frazier on 17 November 1988. Frazier was a widower in his early 60's who lived alone in the Frayser area of Memphis. A prime witness at the trial was Thomas Lovett, the 16–year–old son of Donna Lovett, a co-defendant who was tried separately. Defendant and Donna Lovett were living together in Ripley, Tennessee. Shortly before the homicide Thomas Lovett, who had been living with his father in Memphis, came to live with his mother and defendant. The boy testified that on Wednesday night, November 16, 1988, the defendant and Ms. Lovett had been experimenting with putting Visine in beer. They told his older brother Bryant to drink it, and when it put him to sleep defendant said, "All right, it worked." On Thursday, November 17, 1988, Thomas, his brother Bryant, his mother and the defendant drove to Memphis to get the younger boy's school records so he could enroll in school in Ripley. They kept driving by a house in the Frayser area where the defendant said

they were going to borrow some money from a friend. After driving by the house several times they finally saw a car at the house and determined that someone was home. Defendant dropped Ms. Lovett off at the corner, then took Bryant and Thomas to the home of Bryant's girlfriend where he left them. He later came back and picked up the two boys. The three of them returned to Frayser to the house trailer residence. Defendant and Bryant left Thomas there. They took defendant's car and returned to Ripley. When Thomas awoke the next morning all three of the others were there. He, Michael and Bryant went shopping and Michael bought various articles of clothing for the three of them. Defendant told Thomas he had borrowed six or seven hundred dollars. After they finished shopping they went to a laundry and washed clothes. While they were driving about they crossed a bridge, defendant asked Thomas to hand him a paper sack from the back passenger area where he was sitting. He handed the sack to defendant and he threw it out of the car, "but it missed the bridge." They backed up and retrieved the items which had fallen from the bag, threw it over the bridge rail and then drove off. He thought the bag contained trash but saw that it contained "a telephone and some balled-up paper and stuff like that." That night defendant, Bryant and Thomas went out driving. A little later they dropped defendant off at a bar Bryant and Thomas continued to drive around for awhile. Subsequently the two young men returned and picked up Michael and a female who he did not know. At defendant's request they dropped him and the woman off at a motel and they went home.

Bryant Lovett was classified as an accomplice by the trial judge. It was his testimony that on 14 November 1988, he was living with his mother and Michael Bane and was present when a discussion took place about obtaining some money. His mother mentioned the name of a man named Royce Frazier. Defendant said if they robbed the man they would have to kill him because he knew my mother and would be able to turn her in. He testified

he had met Mr. Frazier at a cafe called the "Log Cabin" where his mother had worked and Frazier was a regular customer. His mother remarked that Frazier would be getting back in town soon and would have money when he got back in town. He testified that during the discussion about killing Mr. Frazier he mentioned that they could choke him. On November 16, when Michael, his mother, his brother and he were returning from Memphis his mother put about three-fourths of a bottle of Visine in a beer and he chugged it down. He did fall asleep. On the next day, 17 November 1988, the four of them drove to Memphis to get his brother's school records. They went out to Frayser where they drove by Roy (sic) Frazier's house to see if his car was there or not in order to determine if he was at home. They stopped at a 7-11 store where they called his father's house and determined he was at home. They drove by Frazier's residence again and saw that he was there. They went to his father's house where they picked up some of Tommy's clothes then returned to Frayser. They dropped Ms. Lovett off on the corner close to the Frazier residence and Michael took him and his brother over to his girlfriend's house. He knew that his mother was supposed to be getting Roy to sleep so Michael could go back and enter the house to get the money. Defendant called about 8:30 and said the plans were just getting under way and he was coming over to pick up him and his brother to take them back to Ripley. The three of them returned to Ripley where they left his brother. He and defendant returned to Frayser. When they reached Frazier's house the front porch light flickered and they pulled up in the driveway. This was a signal from his mother for Michael to come in. Defendant started walking toward the house then returned to the car. They pulled out of the driveway, drove around the block a couple of times and parked on the street corner near Frazier's house. They waited for about five (5) minutes and then the light flickered on and off again. Defendant got out of the car and walked into the house. He said it seemed as if he waited at least two (2)

hours and he was getting scared because he knew what was going on and knew his mother was in the house. He was scared for her. He got out of the car and walked halfway up the driveway to the house when a dog barked in the back yard. This frightened him and he returned to the car. In approximately 10 minutes his mother and Michael came running out of the house toward the car. He got out of the front seat and opened the door on the passenger side to get in the back. It frightened his mother because she didn't know that he was in the car. They were carrying a shotgun, a stereo, a bunch of telephones, a pack of cigarettes, a lighter, a white shirt, and a camera in a black case. They put all of these items in the back passenger compartment and drove off headed back to Ripley. As they were driving along defendant commented, "I did such a good job, I deserve a beer." They stopped at a convenience store to get a beer and then continued their journey. They stopped again at a bridge where he was told to throw some telephones, the cigarettes, the lighter and a few other things from the bridge. They drove further when his mother realized she had Roy's wallet. They pulled over to the side of the road, put the wallet in a paper sack, poured brake fluid on it and set it on fire and burned the wallet. On the way back to Ripley, Michael told him that when he went into Frazier's house Royce was in the bathroom and he stood in the living room waiting for him to come out. When Royce came out, "He said that he hit 'Roy' with all he had and all he did was fall down and get right back up. And he had told me, that he had tried, that he had his hands in Roy's pants cutting his nuts and that he put a cord around Roy's neck and that my mother had put a plastic bag over Roy's head, and that they had put him in a bathtub full of water." Defendant told him he got $726 from Roy. He knew defendant had a knife that night because he had given it to defendant while he was taking him and his little brother over to his girlfriends. When they arrived at the trailer Tommy was asleep. He tried to go to sleep and dozed off. About 2:30 he was awakened by his mother. She was crying and he referred to her as hysterical. Eventually she returned to bed. When he awakened in the morning his mother, Michael and his brother had already had breakfast and were preparing to go to the laundromat. He remained at the trailer and at some time threw away the jacket Michael had worn the night before because it had blood on it. When the others returned he, Michael and Tommy went to a country and western store in Dyersburg where Michael bought boots and clothing for the two boys and for himself. The total bill was $228 which he paid in cash. That night he, Michael and Tommy went out driving. He and Michael noticed that there was a paper sack in the car containing a phone and also a cord which he said Michael had used to strangle Royce. They did not want Tommy to know what they were doing so they put garbage in the top of the paper sack which they intended to throw off a bridge while he drove across it. Bryant threw it out and missed. They turned around, drove back, got out and threw it over the bridge. They told his brother it was trash. They took Michael to a place called "The Loafers Lounge" where they waited while Michael was inside. When he returned about an hour later he had Joanie with him. Bryant and Tommy then took Michael and Joanie to a motel. He and Tommy went to Dyersburg where they got something to eat and played some video games. They then went home. His mother asked where Michael was and he told her he had dropped him and Joanie off at a motel. His mother appeared hurt and angry at Michael. He took her to the motel and showed her where Michael and Joanie were. He watched her while she made two calls from a pay phone in front of the motel. She called the Memphis police and also Sheriff Durham. The sheriff came to the motel where he talked with his mother. Sheriff Durham then told him to follow them back to the sheriff's station.

There was other evidence in the record that personnel in the Memphis Police Department received a telephone call from a woman at approximately 2:30 a.m. on the morning of November 19, 1988. As a result officers initiated an investigation at

3320 Madewell, Frayser, the residence of Royce Frazier, to determine if he was dead. The police found Mr. Frazier's dead body in the bathtub. The tub was almost full of water. There was a clear plastic bag over his head and what appeared to be an electrical cord around his neck. There was a gag in his mouth which was tied behind his head. A bathroom type plunger with a rubber suction on it was over his head.

Sheriff Wilford Durham testified that he arrested Donna Lovett in front of the Walker Motor Court in Ripley where she was talking on the telephone to a representative of the Memphis Police Department. After talking to the Memphis officer he also arrested the defendant who was found in Room 22 of the Walker Motor Court with a young lady named Joanie Sanderson.

Dr. Richard Harruff testified that he performed the autopsy on the body of Royce Frazier. When he first saw the body on November 19, 1988 he observed injuries to the head and neck. There was an electric cord tied around his neck, a plastic bag over his head and a gag in his mouth. His findings indicated that Mr. Frazier had died of ligature strangulation with other possibilities of asphyxia. Asphyxia is a general term when means a mechanism of dying in which the oxygen is cut off from the body tissues, by cessation of blood flow which cuts off the supply of oxygen and blood to the brain. This could have been caused by the electric cord around his neck, suffocation from the plastic bag over his head, or choking on his tongue which was shoved back in his throat by the tight gag in his mouth. There were bruises on the neck and the skin underlying the cord and other bruising about both eyes. There was bruising and lacerations to the left cheek and left upper lip. There were two areas of bruising on the right scalp area of the head. There were other bruises about the forearms and wrists.

Items of evidence found in defendant's automobile included a .12 gauge shotgun an AM/FM stereo radio, a camera, and a leather vest, all of which were the property of the deceased.

The evidence clearly establishes that this was a planned, premeditated and deliberate homicide committed by the defendant, as found by the jury, in the perpetration of a robbery. The issue is without merit.

■ In a tripartite complaint concerning the trial court's instructions to the jury the defendant says first that at the end of the instruction on murder in the perpetration of a robbery the court told the jury it was not necessary that the State prove an intention to kill. The court instructed the jury on this issue that: "For you to find the defendant guilty of murder in the first degree in the perpetration of a robbery, the State must have proven beyond a reasonable doubt: (1) that the defendant unlawfully killed the alleged victim; (2) that the killing was committed during the alleged perpetration of the robbery; that is, that the killing was closely connected to the alleged robbery, and was not a separate, distinct and independent event; and (3) that the defendant specifically intended to commit the alleged robbery. If you should find that the above three elements exist beyond a reasonable doubt, to a moral certainty, it is not necessary that the State prove an intention to kill, or that the alleged killing was done willfully, deliberately, with premeditation, and with malice." This was a proper statement of the law since malice and an intent to kill are not elements of felony murder. T.P.I.—Crim. 20.202; *State v. McKay,* 680 S.W.2d 447, 451 (Tenn. 1984).

■ In reference to the instruction on circumstantial evidence defendant says that the trial judge erroneously instructed the jury that it was not necessary that each particular fact be proved beyond a reasonable doubt. He says this instruction placed an undue prominence on the State's burden of proof. This issue is without merit and the authorities cited by defendant do not bear out this claim. The trial judge instructed the jury that "circumstantial evidence consists of proof of collateral facts and circumstances which do not directly prove the fact in issue but from which that fact may be logically inferred. When the evidence is made up entirely of circumstan-

tial evidence, then before you would be justified in finding the defendant guilty, you must find that all the essential facts are consistent with the hypothesis of guilt, as that is to be compared with all the facts proved; the facts must exclude every other reasonable theory or hypothesis except that of guilt; and the facts must establish such a certainty of guilt of the defendant as to convince the mind beyond a reasonable doubt that the defendant is the one who committed the offense. It is not necessary that each particular fact should be proved beyond a reasonable doubt if enough facts are proved to satisfy the jury beyond a reasonable doubt of all the facts necessary to constitute the crime charged. Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion and producing in effect a moral certainty that the defendant, and no one else, committed the offense." These instructions were taken from the Criminal Pattern Jury Instructions, 37.06, and are accurate statements of the law. *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 456–457 (1958).

■ Defendant filed a pretrial motion to dismiss the indictment alleging various constitutional grounds which were not supported by any authority. This motion was overruled by the trial court. In his motion for new trial he made a general charge that the trial court erred in overruling all preliminary motions and stated one general contention that the death sentence violated his Eighth Amendment right against cruel and unusual punishment. Although, as the State notes, defendant's failure to raise the issues asserted on appeal as unconstitutional amounts to a waiver of those issues for the purposes of appellate review, we have considered them and find them to be without merit.

■ He first charges that the death penalty statute is unconstitutional because it places the burden of proof on defendants. The statute referred to by defendant is T.C.A. § 39–13–204(g)(1) formerly T.C.A. § 39–2–203(g), which was in force at the time of defendant's trial. It provides that

if the jury unanimously determines that at least one statutory aggravating circumstance or several circumstances have been proven by the State *beyond a reasonable doubt,* and such circumstance or circumstances have been proven by the State to outweigh any mitigating circumstances *beyond a reasonable doubt,* then the sentence shall be death. It is insisted the statute is unconstitutional because it impermissibly interferes with the jury's discretion to decline to impose the death sentence and creates a "presumption of death." Defendant argues the statute mandates a death sentence when a jury finds the aggravating circumstances to be evenly balanced with the mitigating circumstances and the jury has no discretion to return a life sentence when it finds that the mitigation does not outweigh the aggravation. The court considered this argument in *State v. Boyd,* 797 S.W.2d 589, 596 (Tenn. 1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 800, 112 L.Ed.2d 861 in which we said, "the statute, taken in its entirety, does not in any way unconstitutionally deprive the sentencer of the discretion mandated by the individualized sentence requirements of the Constitution." The United States Supreme Court has noted in *Franklin v. Lynaugh,* 487 U.S. 164, 178–80, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988), that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is not constitutionally required. In *Boyde v. California,* 494 U.S. 370, 376–78, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990), the Court had under consideration a mandatory statutory sentencing scheme similar to that utilized in Tennessee. The appellant in that case argued that the jury must have freedom to decline to impose death penalty even if they decided that the aggravating circumstances outweigh the mitigating circumstances. The Court held there is no constitutional requirement of unfettered sentencing discretion in the jury, and states are free to structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty. The Tennessee statute does not require the defendant to assume the burden of

proving mitigation or that mitigation outweighs aggravation. There is no reasonable likelihood a jury will apply the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. There is no likelihood that this statutory language imposes a presumption of death upon the finding of one aggravating circumstance.

We have previously dealt with defendant's contention that T.C.A. § 39–13–204 is unconstitutional for the reason that it does not require that the reasonable doubt standard applies to the sentencing determination. The jury in this case was instructed that the State must prove that aggravating circumstances outweigh mitigating circumstances *beyond a reasonable doubt* in direct contradiction of defendant's assertion.

■ Relying on the dissenting opinion in *State v. Dicks*, 615 S.W.2d 126 (Tenn.1981), the defendant contends that the death penalty is cruel and unusual punishment under all circumstances. A majority of this Court rejected that contention in *State v. Dicks*, and a number of later cases. This Court has repeatedly held that this State is not prohibited from imposing the death penalty in the manner set forth in T.C.A. § 39–2–202, et seq., [§ 39–13–202] by the restrictions placed on it by the Eighth and Fourteenth Amendment to the United States Constitution, and by Article I, Secs. 19 and 16 of the Tennessee Constitution. *State v. Barber*, 753 S.W.2d 659, 670 (Tenn.1988). *See Miller v. State*, 584 S.W.2d 758 (Tenn. 1979); *Cozzolino v. State*, 584 S.W.2d 765 (Tenn.1979); *Houston v. State*, 593 S.W.2d 267 (Tenn.1980), cert. denied, 449 U.S. 891, 101 S.Ct. 251, 66 L.Ed.2d 117 (1980); *State v. Williams*, 690 S.W.2d 517 (Tenn.1985); *State v. Black*, 815 S.W.2d 166 (Tenn.1991). In *Black*, supra, a majority of the Court engaged in a lengthy analysis of the constitutional recognition of the death penalty under various provisions of the Tennessee Constitution as well as the Eighth Amendment to the Federal Constitution. The Court observed "that the common law rule mandated death for all convicted murders; and except for one brief period from 1915 to 1917, the death penalty has been the statutorily sanctioned punishment for the offense of first degree murder in Tennessee. ... since the founding of this State both constitutions and legislative enactments have contemplated the imposition of the death penalty; and nothing in the constitutional or legislative history of this State mandates that death is invalid *per se* as cruel and unusual punishment under Article I, Sec. 16."

Defendant says the death penalty statute in Tennessee does not sufficiently narrow the class of persons eligible for the death sentence in the case of felony murder.

■ This Court recently considered this issue in *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn.1992), and upheld the validity of the felony murder statute. However, a majority of the Court found that T.C.A. §§ 39–2–203(i)(7) (1982) and 39–13–204(i)(7) (1991) do not narrow the class of death eligible murders sufficiently under the Eighth Amendment to the United States Constitution, and Article I, Sec. 16 of the Tennessee Constitution because they duplicate the elements of the offense. The Court held that "it would ... require a finding of an aggravating circumstance other than T.C.A. § 39–2–203(i)(7) to support death as a penalty." It was further held that although the jury found two (2) aggravating circumstances were supported by the evidence beyond a reasonable doubt, it was necessary to remand the case for resentencing. Even though the evidence amply supported the aggravating circumstance of murder to be especially heinous, atrocious, or cruel in that it involved torture or depravity of mind under T.C.A. § 39–2–203(i)(5) (1982), the majority were unable to conclude that the elimination of the aggravating circumstance (i)(7) was harmless error beyond a reasonable doubt.

Defendant also says the death penalty statute violates Article I, Sec. 19 of the Tennessee Constitution by interfering with the jury's absolute discretion in determining the law and the facts. The particular reference is to that part of Art. 1, Sec. 19 which states that "in all indictments for *libel,* the jury shall have a right to deter-

mine the law and the facts, under the direction of the court, as in other criminal cases." This Court went to great lengths in *Black,* supra at pp. 186–187 to clarify the meaning of the provision of Article I, Sec. 19 in question. Citing from *Harris v. State,* 75 Tenn. 538 (1881) the Court made it clear that *it was not intended, nor does it change the ancient province and rights of a jury in criminal cases,* but only to give the jury, or rather to secure to the jury, the right to do in *libel cases* precisely what they had always done in other criminal cases, to act under the instructions of the court, and judge of the application of the law given to them to the facts proven, and declare the result, either to be innocent or guilt[y], as the legal elements defined by the court are proven to exist or [to] the contrary." (Emphasis in original text). *See State v. Black,* supra, p. 186.

We affirm the judgment of the trial court finding the defendant guilty of murder in the first degree in the perpetration of a robbery. However, in accordance with the opinion of the majority in *State v. Donald Ray Middlebrooks,* the case is remanded to the trial court for resentencing. The jury has found two (2) aggravating circumstances are supported by the evidence beyond a reasonable doubt and even though the evidence amply supports the aggravating circumstance of the murder to be especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, the rule pronounced in *Middlebrooks* establishes that the elimination of the aggravating circumstance that the murder was committed while defendant was engaged in the perpetration of a robbery requires the jury to reconsider the evidence to determine that the sentence of death is appropriate in this case.

Remanded for resentencing.

REID, C.J., and DROWOTA, DAUGHTREY and ANDERSON, JJ., concur.

DROWOTA and O'BRIEN, JJ., concur in the conviction and continue to adhere to their dissent in *Middlebrooks* wherein they stated a remand for resentencing was unwarranted.