FILED

06/17/2026

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON[1]
May 5, 2026 Session

**STATE OF TENNESSEE v. JEREME WALKER AMIS**

**Appeal from the Circuit Court for Benton County**
**No. 23-CR-34      Bruce Irwin Griffey, Judge**
_____

**No. W2025-00359-CCA-R3-CD**
_____

The Defendant, Jereme Walker Amis, was convicted in the Benton County Circuit Court of possession of a firearm after having been convicted of a felony crime of violence, a Class B felony, possession of a firearm after having been convicted of felony drug offense, a Class C felony, and violating the conditions of his community supervision, a Class E felony. After a sentencing hearing, the trial court merged the convictions of possessing a firearm and sentenced him to an effective sentence of twenty-four years in confinement. On appeal, the Defendant contends that the trial court committed plain error by refusing to accept his offer to stipulate to his prior felony convictions, that the trial court abused its discretion by denying his request to bifurcate the charge of violating the conditions of his community supervision, and that his effective sentence is excessive. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

Kendall Stivers Jones (on appeal), Assistant Public Defender – Appellate Division, Tennessee District Public Defenders Conference, Franklin, Tennessee, and Paul D. Hessing (at trial), Assistant District Public Defender, Camden, Tennessee, for the appellant, Jereme Walker Amis.

Jonathan Skrmetti, Attorney General and Reporter; Ryan W. Davis, Assistant Attorney General; J. Neil Thompson, District Attorney General; and Deven Wilson Whitfield and Jennifer A. Hedge, Assistant District Attorneys General, for the appellee, State of Tennessee.

_____

[1] Oral argument in this case was heard at the Shelby County Courthouse in Memphis.

# OPINION

## FACTS

This case relates to a search of the Defendant's residence, which resulted in police officers finding a handgun. In June 2023, the Benton County Grand Jury returned a three-count indictment, charging the Defendant with possessing a firearm after having been convicted of a felony crime of violence, i.e., aggravated sexual battery, in count one; possessing a firearm after having been convicted of a felony drug offense, i.e., possession of methamphetamine with intent to deliver, in count two; and violating the rules of his community supervision for life, which was part of his sentence for aggravated sexual battery, in count three. The Defendant went to trial in November 2023.

After jury selection but before the State's reading of the indictment, the trial court sent the jury out of the courtroom to address pretrial matters. Defense counsel advised the trial court that the Defendant was offering to stipulate to his being unable to own or possess a firearm. Subsequently, defense counsel stated that the Defendant was willing to stipulate "to every element other than possession" so that the only issue for the jury to decide was actual or constructive possession of the firearm. Defense counsel asserted that "everything else is just prejudicial and really doesn't have any bearing on whether he possessed a firearm that day." The State argued that the indictment, which specifically named the Defendant's prior convictions, was "going to go back" with the jury and that, in any event, it was necessary for the jury to hear about the aggravated sexual battery conviction in order for the jury to understand the Defendant's requirement of community supervision for life and why the police could legally search his residence. Defense counsel responded that the indictment did not have to be placed into evidence, but the trial court said it thought the indictment had to be read to the jury. The trial court then asked defense counsel if there was any way to explain the Defendant's being on community supervision for life in count three without the jury's hearing about the conviction of aggravated sexual battery. Defense counsel suggested that the trial court bifurcate count three from counts one and two "[b]ecause if they find him not guilty in one and two, he's not guilty of three." The trial court stated that "bifurcation might be appropriate in circumstances where there's an issue for the jurors on the degree or something" but that the Defendant was essentially requesting to sever count three from counts one and two on the day of trial. The trial court said that the underlying convictions were elements of the offenses charged in counts one and two and that it did not see a way to avoid the jury's hearing about the convictions, particularly in light of in count three. The trial court stated that it would instruct the jurors not to consider the underlying convictions as substantial proof and reiterated that the Defendant should have filed a pretrial motion to sever count three.

After the trial court denied the Defendant's requests to stipulate and bifurcate, the trial proceeded. The trial court gave preliminary instructions to the jury, the State read the indictment, and the Defendant pled not guilty. During the State's opening statement, the prosecutor told the jury that a witness was going to testify that on the day of the crimes, officers from multiple law enforcement agencies were looking for a missing juvenile and went to the Defendant's home to conduct "a sex offender sweep." The prosecutor stated that although the Defendant consented to officers searching his home, the officers could have searched without consent because he was serving community supervision for life. Later in the prosecutor's opening statement, the prosecutor told the jury that the Defendant was on community supervision for life because he had a prior conviction for aggravated sexual battery.

The first witness for the State was Deputy Juan Rios of the Benton County Sheriff's Office ("BCSO"). Deputy Rios testified that on March 17, 2023, a female juvenile was missing in the "Hallshire area" of Benton County. Law enforcement officers from various agencies, including the U.S. Marshals Service, "were going through the area sweeping through sex offenders' houses looking for this missing juvenile." The Defendant was on a list of registered sex offenders in the area, so Deputy Rios and four marshals went to his house to conduct a search. The Defendant answered the door, and one of the marshals explained why they were there. The Defendant was cooperative and gave the officers permission to search his residence. Deputy Rios said the Defendant was alert and "seemed normal."

Deputy Rios testified that he and the marshals went into a bedroom and that a woman named Heather Wright was asleep on the bed. Deputy Rios stated that he knew Ms. Wright from previous encounters with her, that he knew the Defendant and Ms. Wright were "on-and-off boyfriend/girlfriend," and that he knew Ms. Wright to be at the Defendant's house "pretty frequently." Deputy Rios said that he tried to talk with Ms. Wright but that she was "completely out of it" and "would answer a question and then just conk right back out asleep." One of the marshals standing behind Deputy Rios said, "'Well, hey, look there[.]'" Deputy Rios turned around and saw the marshal pointing to a dresser. Deputy Rios saw "a little handgun" in a holster on the dresser. He knew the Defendant was a convicted felon and a sex offender, so he collected the weapon.

On cross-examination, Deputy Rios testified that he thought there were two bedrooms in the home. Ms. Wright was the only person in one of the bedrooms, and the gun was in plain view on the dresser. Ms. Wright could not reach the gun from the bed. Deputy Rios said he did not take a statement from Ms. Wright because she "could barely talk" to him. He collected the firearm, in the holster, and turned it over to Bobby Ferguson.

- 3 -

Lieutenant Bobby Ferguson of the BCSO testified that he was called to the Defendant's home on March 17, 2023, because officers had found a firearm. When he arrived, the Defendant was handcuffed in the laundry room. Lieutenant Ferguson knew the Defendant to be "a sex offender, convicted felon." He read *Miranda* warnings to the Defendant and asked about the firearm. The Defendant told Lieutenant Ferguson that he "found it in a box of fittings at Benton County Plumbing." The Defendant said that he worked for Kerry Farmer at Benton County Plumbing "from time to time" and that the box of fittings was in a warehouse.

Lieutenant Farmer testified that he did not question Ms. Wright about the gun because it was his understanding "she was not in any kind of condition to be giving a statement." Regardless, the Defendant claimed possession of the firearm, so Lieutenant Ferguson had no reason to speak with Ms. Wright about the gun. He collected the firearm and took it out of the holster. The gun was loaded with six rounds in the magazine; the chamber was empty. Lieutenant Ferguson said that the Defendant appeared to have been "woken up" but that the Defendant's ability to understand what was happening was "perfectly fine." The Defendant did not say he had consumed any drugs, and Lieutenant Ferguson did not see any drugs in the home. Based on the Defendant's information about the gun, Lieutenant Ferguson went to Benton County Plumbing to speak with Mr. Farmer.

On cross-examination, Lieutenant Ferguson testified that he did not have the Defendant sign a waiver of rights form and that he did not video- or audio-record his encounter with the Defendant. Lieutenant Ferguson acknowledged that according to his written report, the Defendant claimed to have "found" the gun in the box of fittings; the Defendant did not say he "held" or "took" the gun. Lieutenant Ferguson said he "assume[d]" the Defendant carried the gun to the Defendant's house. On redirect-examination, Lieutenant Ferguson testified that he did not know the Defendant worked at Benton County Plumbing until the Defendant told him so.

Kerry Farmer testified that he worked at Benton County Plumbing and that the Defendant used to work for him. Lieutenant Ferguson spoke with Mr. Farmer about a gun. At that time, Mr. Farmer did not know his gun was missing. He identified the gun for the jury and said it was small, thirty-two caliber North American Arms pistol. Mr. Farmer kept the gun in a box of fittings at Benton County Plumbing. The box was under the passenger seat of his van, which was in a locked warehouse. The Defendant had access to the warehouse. Mr. Farmer said the holster found with the gun did not belong to him.

Mr. Farmer testified that he also knew Ms. Wright because she did cleaning work for him. He said that he could not remember if Ms. Wright cleaned around the time of March 17, 2023, but that he "[p]robably" saw the Defendant one or two days before that date. The Defendant did not have permission to take Mr. Farmer's gun.

On cross-examination, Mr. Farmer testified that Ms. Wright cleaned inside the warehouse and had access to the van. He said that the van was unlocked inside the warehouse and acknowledged that Ms. Wright could have taken the gun. He said that he did not know who took the firearm and that he did not remember the last time he saw the gun in the box of fittings.

Officer Tara Paige of the Tennessee Department of Correction Probation and Parole testified that she supervised convicted sex offenders in Benton and Decatur Counties and that she began supervising the Defendant in 2018. The Defendant was on community supervision for life. As a condition of his supervision, he was required to obey the laws of the United States and Tennessee. She explained that if the Defendant was charged with a misdemeanor, then the violation also was a misdemeanor. If the Defendant was charged with a felony, then the violation also was a felony. The State asked her to name the specific charge for which he was being supervised, and she answered, "Aggravated sexual battery." At that point, the State advised the trial court that the State and the Defendant were stipulating to certified judgments of conviction being entered into the record, and the trial court admitted the Defendant's judgments of conviction for aggravated sexual battery and possession of methamphetamine into evidence. Officer Paige said the Defendant was not allowed to possess a weapon as a condition of his supervision. At the conclusion of her testimony, the State rested its case.

During the Defendant's case-in-chief, the parties stipulated to the admission into evidence of three judgments of conviction for Ms. Wright. The judgments showed that she pled guilty to three counts of child abuse and neglect, a Class D felony, in 2014.

Officer Jonathan Pinion testified that he was the Jail Administrator for the BCSO. On March 17, 2023, Officer Pinion tried to book the Defendant into the jail but was unable to complete the process. He explained that when the Defendant arrived at the jail, the Defendant was "very talkative and cooperative" and answered his questions. Officer Pinion asked the Defendant when he last consumed drugs or alcohol, and the Defendant said a few hours before his arrest. Shortly thereafter, the Defendant began "starting to slouch" and "rocking, trying to stay awake." The Defendant could no longer answer Officer Pinion's questions, so Officer Pinion noted the Defendant's condition on his medical intake form and placed him in "male detox on unofficial medical watch" so that he could be watched at all times.

On cross-examination, Officer Pinion testified that when the Defendant first arrived at the jail, "[y]ou could tell he was a little frustrated about being arrested and brought to jail." A few minutes later, the Defendant's demeanor changed. Officer Pinion stated, "[H]e was rocking back and forth. . . . His speech was getting slurred. He couldn't answer any

questions." Officer Pinion said he placed the Defendant on unofficial medical watch, where the Defendant "literally just slept." A few days later, the Defendant told a sergeant that he might harm himself, so the Defendant was placed on suicide watch.

The Defendant testified that on March 16, 2023, Ms. Paige conducted a home visit. The Defendant had been released from jail earlier that week and had allowed Ms. Wright to stay with him. Ms. Wright was sweeping in the kitchen while Ms. Paige was there. That night, the Defendant and Ms. Wright visited friends and "[g]ot high." When they returned home, Ms. Wright slept in a bedroom, and the Defendant stayed in the living room. He did not have a gun.

The Defendant testified that the next morning, he was "passed out" in the living room and Ms. Wright was still asleep in the bedroom when law enforcement arrived. The door to the bedroom was closed, and the Defendant never saw a gun in the bedroom. A police officer showed a flyer with a girl's photograph on it to the Defendant, and the Defendant said he had never seen the girl. The Defendant allowed the officers into his home to conduct a search because he did not have anything to hide. During the search, he heard an officer yell, "'We found a gun.'"

The Defendant testified that he did not remember speaking with Lieutenant Ferguson. He said that he had been a convicted felon for twenty-seven years, that he knew he was not allowed to have weapons, and that he did not claim possession of the firearm. He said that he did a lot of work for Mr. Farmer but that he did not know anything about a gun in a box of fittings. He said that he had never seen the gun in question before March 17, 2023, and that he did not take the gun.

On cross-examination, the Defendant testified that he would not have told Lieutenant Ferguson that he found the gun because he knew he could not possess a firearm. The State asked how Lieutenant Ferguson knew to talk with Mr. Farmer, and the Defendant answered, "Everybody in town knows I worked for Kerry Farmer, and it's on my sex offender registry where I worked." The Defendant said that he did not know Lieutenant Ferguson prior to March 17, 2023, and that Lieutenant Ferguson must have discovered that he worked at Benton County Plumbing from the registry. The Defendant said he was "high as can be" from methamphetamines, heroin, and Fentanyl when he arrived at the jail.

At the conclusion of the Defendant's testimony, the jury found him guilty as charged in the indictment of possession of a firearm after having been convicted of a felony crime of violence, possession of a firearm after having been convicted of a felony drug offense, and violating the conditions of his community supervision. After a sentencing hearing, the Defendant received an effective sentence of twenty-four years in confinement.

## ANALYSIS

## I.  Stipulation

The Defendant claims that the trial court erred when it did not allow him to stipulate to his prior convictions for a felony crime of violence and a felony drug offense.  He asserts that the State's reading the indictment to the jury was not a valid reason to deny his offer to stipulate because reading the indictment was not required.  He also asserts that proof of his being a sex offender was not relevant to the jury's determination of whether he possessed the firearm, was not necessary to explain why law enforcement went to his house to conduct a search, and was unfairly prejudicial.  The State argues that we can only review this issue for plain error because the Defendant failed to raise it in his motion for new trial and, in the alternative, that the trial court properly denied the request to stipulate because the jury needed information about the Defendant's prior convictions to understand why law enforcement went to his home and could legally search his residence.

Initially, we agree with the State that the Defendant has waived plenary review of this issue because he failed to raise it in his motion for new trial.  *See* Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise, such issues will be treated as waived").  The Defendant acknowledges this failure and requests plain error review in his reply brief.

As a general matter, we have cautioned against the practice of raising plain error review for the first time in a reply brief when the risk of waiver was plausible or reasonably apparent at the time the opening brief was filed.  *See State v. Neece*, No. E2023-01654-CCA-R3-CD, 2026 WL 413050, at *5 n.1 (Tenn. Crim. App. Feb. 13, 2026), *perm. app. pending; State v. Nunez*, No. M2024-00179-CCA-R3-CD, 2025 WL 1892446, at *9 (Tenn. Crim. App. July 9, 2025), *perm. app. denied* (Tenn. Nov. 20, 2025).  After all, "a routine practice of allowing plain error arguments to surface first in a reply brief undermines the appellate process and rewards strategic silence over timely advocacy."  *Nunez*, 2025 WL 1892446, at *9.

Notwithstanding this general admonition, we elect, as a matter of discretion, to consider the Defendant's request for plain error review in this case.  The Defendant's principal brief raised related challenges concerning the trial court's denial of his requests for bifurcation and stipulation, issues that frequently involve overlapping and easily conflated terminology.  As this court has observed, the terms "severance," "bifurcation," and "stipulation" describe distinct procedural mechanisms that are nonetheless used interchangeably by litigants, sometimes leading to confusion about which mechanism governs a particular claim.  *See, e.g., State v. Johnson*, No. W2018-01222-CCA-R3-CD,

2019 WL 6045569, at *14 (Tenn. Crim. App. Nov. 14, 2019), *perm. app. denied* (Tenn. Apr. 1, 2020); *State v. Richardson*, No. W2016-02227-CCA-R3-CD, 2018 WL 821775, at *15 n.12 (Tenn. Crim. App. Feb. 9, 2018), *no perm. app. filed*. Given the close relationship between the Defendant's claims, and the need to provide guidance in this area, we exercise our discretion to consider plain error review notwithstanding the timing of the Defendant's request.[2]

We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

Regarding counts one and two, Tennessee Code Annotated section 39-17-1307(b)(1)(A) provides that a person commits an offense "who unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon." The indictment alleged that the Defendant had two qualifying prior felony convictions: aggravated sexual battery in 1997 and possession of methamphetamine with intent to deliver in 2014. Regarding count three, Tennessee Code Annotated section 39-13-526(a) provides that it is an offense for a person to knowingly violate a condition of community supervision. "If the conduct that is a violation of a condition of community supervision also constitutes a criminal offense that is classified as a felony, the violation is a Class E felony." Tenn. Code Ann. § 39-13-526(b)(3).

---

[2] We observe that the State, apparently anticipating that the Defendant would respond to its plain error argument, has analyzed all five plain error factors in its response brief. We emphasize, however, that the State's anticipatory briefing is not itself a basis to engage in plain error review. Were the rule otherwise, an appellee's practice of briefing anticipated arguments would itself validate an appellant's strategic silence on waiver issues. Instead, the State's briefing on the plain error factors here simply means we need not request supplemental briefing on this issue.

Our supreme court has stated that "when the sole purpose of introducing evidence of a defendant's prior convictions is to prove the status element of the offense, and when the defendant offers to stipulate his status as a felon, the probative value of the evidence is, as a matter of law, outweighed by the risk of unfair prejudice." *State v. James*, 81 S.W.3d 751, 762 (Tenn. 2002) (adopting the United States Supreme Court's holding in *Old Chief v. United States*, 519 U.S. 172 (1997)). Here, the Defendant offered to stipulate "to every element" of the offenses except possession. Although the State claims that evidence about the Defendant's prior sexual offense provided context as to why the officers needed to search his home, we find no merit to this claim. The State's witnesses could have testified that law enforcement was searching homes in the area for a missing juvenile and that the Defendant consented to a search, both of which were true, without introducing evidence of the Defendant's prior conviction for aggravated sexual battery and without confusing the jury. Furthermore, while the reading of an indictment to a jury may be "an appropriate and proper procedure," the State cites no authority that says the reading of an indictment is required, and we have found none. *State v. Bane*, 853 S.W.2d 483, 484 (Tenn. 1993).

That said, we cannot conclude that consideration of the trial court's error is necessary to do substantial justice. The evidence shows that the officers found the gun in the Defendant's home. The Defendant told Lieutenant Ferguson that he worked for Mr. Farmer at Benton County Plumbing and that he found the gun there. He even gave Lieutenant Ferguson a specific location for the weapon: inside a box of fittings in a warehouse. Based on the Defendant's information, Lieutenant Ferguson spoke with Mr. Farmer about the gun. Mr. Farmer confirmed that he kept the gun in a box of fittings, that the box was in a warehouse, and that the Defendant had access to the gun. Thus, the evidence against the Defendant was overwhelming. Moreover, the trial transcript shows that the trial court instructed the jury in the final jury charge that the jurors could not consider the Defendant's prior convictions of aggravated sexual battery or possession of methamphetamine as proof of his disposition to commit any of the crimes alleged in the indictment. We generally presume that a jury has followed the trial court's instructions. *See State v. Butler*, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Finally, at oral arguments, counsel for the Defendant conceded that even if the trial court had allowed the Defendant to stipulate, the jury still would have heard that the Defendant had prior convictions for a felony crime of violence and a felony drug offense. For these reasons, we conclude that the Defendant is not entitled to plain error relief.

## II.  Bifurcation

The Defendant claims that the trial court erred by denying his request to bifurcate count three after the trial court refused his offer to stipulate. The State argues that the trial court did not abuse its discretion by denying the Defendant's request to bifurcate. We agree with the State.

"Rulings on the admissibility of evidence are largely within the sound discretion of the trial court." *James*, 81 S.W.3d at 760 (Tenn. 2002) (citing *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997)). "Bifurcation concerns splitting a charge into two separate determinations involving guilt and punishment by the same jury." *Richardson*, 2018 WL 821775, at *15 n.12. For example, when a second or subsequent violation of the same offense results in an enhanced punishment, such as cases involving simple possession, driving under the influence, and domestic assault, separate guilt and penalty phases are required to minimize prejudice to the defendant. *See* Tenn. Code Ann. § 40-35-203(e); *Bailey v. State*, No. W2022-01405-CCA-R3-HC, 2023 WL 4106264, at *3 (Tenn. Crim. App. June 21, 2023) (citing Tenn. Code Ann. § 39-17-418(e) (simple possession); Tenn. Code Ann. § 55-10-411(b)(2) (driving under the influence); Tenn. Code. Ann. § 39-13-111(c) (domestic assault)), *perm. app. denied* (Tenn. Sept. 12, 2023). Moreover, when a defendant "is charged with offenses involving the use of violence and force and also charged with the status offense of unlawful possession of a firearm for having a similar prior felony conviction," bifurcation of the charge for unlawful possession of a firearm from the remaining charges is the "better procedure" to avoid undue prejudice to the defendant. *State v. Foust*, 482 S.W.3d 20, 46-47 (Tenn. Crim. App. 2015). However, bifurcation of status offenses is not required, and "no procedure has been prescribed by [the appellate courts] for bifurcation proceedings in contexts involving a charge of possessing a firearm as a convicted felon." *Johnson*, 2019 WL 6045569, at *13.

The Defendant claims that the trial court should have bifurcated count three, which charged him with violating the conditions of his community supervision for life, from counts one and two, which charged him with possessing a firearm after having been convicted of a felony crime of violence and a felony drug offense, respectively, so that the jury was not informed of and prejudiced by his status as a sex offender. As discussed previously, the trial court should have granted the Defendant's request to stipulate rather than allow the State to present evidence of his specific convictions. However, as the Defendant recognizes in his brief, all of the offenses charged in this case were status offenses. Therefore, unlike a case in which a defendant is charged with offenses involving the use of violence and also charged with unlawful possession of a firearm for having a similar prior felony conviction, stipulation, not bifurcation, was the proper way to ameliorate prejudice in this case. Accordingly, the trial court did not err by denying the Defendant's request to bifurcate count three.

As to the Defendant's claim that the trial court confused severance with bifurcation, severance, as relevant to this case, deals with separating charges from a single indictment into separate trials with different juries. *See State v. Williams*, No. W2018-00924-CCA-R3-CD, 2020 WL 211546, at *28 n.21 (Tenn. Crim. App. Jan. 14, 2020), *perm. app. denied* (Tenn. June 5, 2020). The trial court's comment that "bifurcation might be appropriate in

circumstances where there's an issue for the jurors on the degree or something" shows that the trial court recognized bifurcation as a way to separate the determination of guilt and punishment to reduce prejudice. However, the trial court's insistence that the Defendant should have filed a motion to sever count three before trial suggests that the trial court did not recognize bifurcation as a way to separate the determination of guilt in status and non-status offenses to reduce prejudice. In any event, bifurcation was not appropriate in this case. Moreover, defense counsel stated at oral arguments that severance also was not appropriate, and severance is not raised on appeal. Therefore, the Defendant is not entitled to relief.

### III.  Sentencing

The Defendant claims that his effective twenty-four-year sentence is excessive because it is greater than that deserved for the offenses committed and is not the least severe measure necessary to achieve the purpose and principles of sentencing. The State argues that the trial court properly sentenced the Defendant. We agree with the State.

No witnesses testified at sentencing, but the State introduced the Defendant's presentence report into evidence. According to the report, the forty-nine-year-old Defendant dropped out of high school in the tenth grade but obtained his GED while incarcerated. The Defendant said in the report that he was bipolar and experienced violent mood swings and depression and that he was taking medications for those conditions. The Defendant also said that he began consuming drugs and alcohol when he was ten years old but that he was drug and alcohol free while he was incarcerated from 1997 to 2008. He stated that he had tried to stop consuming drugs and alcohol many times and that he had received treatment but not rehabilitation. The report showed that the Defendant worked as a laborer for Hood Container Corporation in 2021 and American Shell Company in 2018 and that he performed plumbing work for Mr. Farmer from 2019 until he was incarcerated in 2023.

The Defendant's criminal record showed the following prior convictions and their disposition dates: disorderly conduct in 1992; criminal trespass and failure to carry and display a license on demand in 1993; driving on a suspended license and contributing to the delinquency of a minor in 1994; felony theft, misdemeanor theft, and passing a worthless check in 1995; aggravated sexual battery in 1997, for which he received a twelve-year sentence to be served in confinement at one hundred percent; possession of a Schedule II drug in 2014, for which he received an eight-year sentence to be served in confinement; speeding, violating the financial responsibility law, failure to appear, and violating the conditions of his community supervision in 2022; and casual exchange and violating the conditions of his community supervision in 2023. Additionally, the report showed that the Defendant's probation or parole was revoked in 1995, 1997, and 2019. The Defendant's

Strong-R assessment classified his overall risk to reoffend as moderate with high needs in mental health and moderate needs in education, family, and alcohol and drug use.

At the conclusion of the hearing, the trial court stated that it had considered the evidence presented at trial and sentencing, the presentence report, the sentencing principles, the arguments of counsel regarding sentencing, the nature and characteristics of the criminal conduct, enhancement and mitigating factors, and statistical information from the Administrative Office of the Courts. The trial court found that the Defendant was a Range II, multiple offender and that the following enhancement factors applied to his convictions: (1) "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (8) "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"; and (13) at the time the felony was committed, the defendant was released on bail or pretrial release. Tenn. Code Ann. § 40-35-114(1), (8), (13). Defense counsel requested that the trial court apply mitigating factor (1), "[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury[.]" *Id*. at § 40-35-113(1). However, the trial court refused to apply that factor, concluding that the Defendant's constructive possession of the firearm placed the officers who searched his home in danger. The trial court found that no mitigating factors applied and concluded that the maximum punishment in the range was warranted for each conviction. Accordingly, the trial court sentenced the Defendant to twenty years at eight-five percent release eligibility for possession of a firearm after having been convicted of a felony crime of violence, a Class B felony; ten years to be served at eighty-five percent release eligibility for possession of a firearm after having been convicted of a felony drug offense, a Class C felony; and four years to be served at thirty-five percent release eligibility for violating the conditions of his community supervision for life, a Class E felony. *See id*. at 40-35-112(b)(2), (3), (5). The trial court merged the convictions of possessing a firearm and ordered that the Defendant serve the four-year sentence consecutively to the twenty-year sentence for a total effective sentence of twenty-four years in confinement.[3]

This court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the mitigating

---

[3] The Defendant was statutorily required to serve the four-year sentence for violating the conditions of his community supervision consecutively to the sentences for possessing a firearm. Tenn. Code Ann. § 39-13-526(c).

and enhancement factors, (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, (7) any statement by the Defendant in his own behalf about sentencing, and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

In sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and that is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Additionally, a trial court is to consider a defendant's potential or lack of potential for rehabilitation or treatment. *Id*. at § 40-35-103(5). The burden is on the defendant to demonstrate the impropriety of his sentence. *See id*. at § 40-35-401, Sent'g Comm'n Cmts. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114. *Id*. at § 40-35-210(c).

Tenn. Code Ann. § 40-35-210(c). The trial court should consider enhancement and mitigating factors, but the statutory factors are advisory only. *See id*. at § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343-44 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id*. at 346.

The Defendant claims that his sentence is excessive because his constructive possession of the firearm, which did not have a bullet in the chamber, did not place anyone at risk; he was compliant and cooperative with his community supervision officer just one day before his arrest and with police officers the day of his arrest; his conviction of aggravated sexual battery was not a violent offense at the time of his conviction in 1997 and was the only violent behavior on his criminal record; the remainder of his convictions were drug and traffic related; and the community supervision statute already ensured a lengthier sentence by requiring that he serve the four-year sentence consecutively to the twenty-year sentence pursuant to Tennessee Code Annotated section 39-13-526(c). However, in pronouncing the Defendant's sentence, the trial court stated that despite his time in prison, the Defendant chose to commit crimes rather than obey the law. The record supports the trial court. The Defendant has been committing crimes since he was eighteen years old. Although he has spent a significant amount of his adult life in confinement, he remains unable to follow the law. He has repeatedly violated sentences of probation and parole and the conditions of his community supervision for life. According to his own testimony, he was released from jail just prior to being arrested for possessing a firearm in this case. The trial court found that three enhancement factors applied, and the Defendant does not contest the applicability of those factors. The trial court sentenced the Defendant within the correct ranges of punishment, and we conclude that the Defendant has failed to show the trial court abused its discretion by ordering that he serve twenty-four years in confinement.

## CONCLUSION

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

s/ JOHN W. CAMPBELL
JOHN W. CAMPBELL, SR., JUDGE